1  Robert M. Bodzin, State Bar No. 201327
   Derek H. Lim, State Bar No. 209496
2  BURNHAM BROWN
   A Professional Law Corporation
3  P.O. Box 119
   Oakland, California 94604
4  ---
   1901 Harrison Street, 11th Floor
5  Oakland, California  94612
   Telephone:    (510) 444-6800
6  Facsimile:    (510) 835-6666

7  Attorneys for Defendant
   R&D MEDIA NORTH AMERICAS B.V. d/b/a GLOMOBI
8

9

10              UNITED STATES DISTRICT COURT

11       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

12  WILLIAM PFROMMER and MICHAEL        Action No.
    WATSON, individually and on behalf of a   [Stanislaus County Superior Court Action
13  class of similarly situated individuals    No. 636593]

14              Plaintiffs,            **DEFENDANT R&D MEDIA NORTH**
                                       **AMERICAS B.V. d/b/a GLOMOBI's**
15  v.                                 **NOTICE OF REMOVAL OF CIVIL**
                                       **ACTION  FROM STATE COURT [28**
16  R&D MEDIA NORTH AMERICAS B.V.      **U.S.C. §§ 1332, 1441, 1446 AND 1453]**
    D/B/A GLOMOBI, a Dutch company,
17  MBLOX, INC., a Delaware corporation,   Complaint Filed:  January 15, 2009
                                           Trial Date:  None Set
18              Defendants.

19

20       TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT

21  FOR THE EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION:

22       PLEASE TAKE NOTICE that Defendant R&D MEDIA NORTH AMERICAS B.V.

23  D/B/A GLOMOBI ("Defendant") hereby remove the state court action described below to the

24  United States District Court for the Eastern District of California, Fresno Division, pursuant to

25  28 U.S.C. §§ 1332, 1441, 1446 and 1453.

26              Compliance With Statutory Requirements

27       1.       On January 15, 2009, a putative class action was commenced in the Superior

28  Court of the State of California in and for the County of Stanislaus, Case No.  636593. A copy

1

1  of the Complaint is attached hereto as Exhibit A. On June 8, 2009, Plaintiffs filed a First

2  Amended Complaint under the same case number. A copy of the First Amended Complaint is

3  attached hereto as Exhibit B. On August 5, 2009, Plaintiffs filed a request for the voluntary

4  dismissal as to Defendant AdMarvel and request for leave to file a Second Amended

5  Complaint. A copy of the request for leave and proposed Second Amended Complaint are

6  attached hereto as Exhibit C.

7      2.    Each of Plaintiffs' three complaints (the "Complaints") assert claims for: (1)

8  violation of California Civil Code section 1770; (2) violation of California Business and

9  Professional Code section 17200; (3) unjust enrichment; (4) trespass to chattels; and (5)

10  tortious interference with a contract.

11      3.    The first date upon which Defendant received a copy of the original Complaint

12  was July 15, 2009 when Defendant received a copy by mail. Defendant's removal of this action

13  is timely because Defendant is removing this matter within 30 days of receiving a copy of the

14  complaint. (See 28 U.S.C. § 1446(b)) As required by 28 U.S.C. § 1446(a), a true and correct

15  copy of all process, pleadings, and orders served upon Defendant not already attached as exhibits

16  are attached as Exhibit D to this Notice of Removal.

17      4.    Pursuant to 28 U.S.C. § 1446(d), Defendant promptly will provide written Notice

18  to Adverse Parties of Removal of the action to Plaintiffs, and will promptly file a copy of this

19  Notice of Removal with the Clerk of the Superior Court of the State of California, County of

20  Stanislaus.

21      5.    By removing this case, Defendant does not waive and is not estopped from

22  raising any defenses that were available to it in State Court.  Specifically, Defendant does not

23  waive by this notice any objection based on insufficiency of process or service or lack of

24  personal jurisdiction.

25  <u>Intradistrict Assignment</u>

26      6.    Plaintiffs filed this case in the Superior Court of California, County of Stanislaus;

27  therefore, this case properly may be removed to the Fresno Division of the Eastern District of

28  California. (See U.S.C. §§ 1441(a) and 1453(b).)

2

1

<u>Jurisdiction</u>

2         7.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C.

3   § 1332(d) (as amended by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat.

4   14 ("CAFA")).  Although complete diversity is required for class actions generally, under

5   CAFA, and pursuant to Section 1332(d), federal courts have original diversity jurisdiction over a

6   class action with merely minimal diversity. Meeting the minimal diversity standard under CAFA

7   requires three showings. (1) that there are at least 100 class members in all proposed plaintiff

8   classes; (2) that any class member (named or not) is a citizen of a different state than any

9   defendant; and (3) that the combined claims of all class members exceed $5,000,000 exclusive

10  of interest and costs. All three requirements are satisfied in this case.

11  The Requirement of More Than 100 Members

12        8.     The first CAFA requirement of at least 100 class members in all proposed

13  plaintiff classes is met in this case. Plaintiff's Complaint, First Amended Complaint and

14  Proposed Second Amended Complaint allege, "The Classes consists of thousands of individuals

15  and other entities nationwide, making joinder impractical, in satisfaction of Code of Civil

16  Procedure § 382." (<u>Complaint</u> Ex. A. at ¶ 53; <u>First Amended Complaint</u> Ex. B. at ¶ 55; <u>Proposed</u>

17  <u>Second Amended Complaint</u> Ex. C. at ¶ 54.)

18  The Requirement of Diversity

19        9.     In this matter, diversity of citizenship exists because Defendant and at least one

20  proposed class member are citizens of different states, thus satisfying the second CAFA

21  requirement for minimal diversity. *See* 28 U.S.C. § 1332 (d)(2)(c). Defendant is a corporation

22  incorporated under the laws of and has its principal place of business in The Netherlands.

23  (Declaration of Tjeerd van Drunen ("van Drunen Dec") attached as Exhibit E at ¶ 2).  Plaintiff

24  William Pfrommer was and is a citizen and resident of Indiana, and Plaintiff Michael Watson

25  was and is a citizen and resident of Stanislaus County, California. (<u>Complaint</u> Ex. A. at ¶¶ 1, 2;

26  <u>First Amended Complaint</u> Ex. B. at ¶¶ 1, 2; <u>Proposed Second Amended Complaint</u> Ex. C. at ¶¶

27  1, 2.)

28  ///

3

The Amount In Controversy Requirement

10.    The third requirement for minimum diversity under CAFA, that the combined

claims of all class members exceed $5,000,000 exclusive of interest and costs, is also met in this

case. Plaintiffs seek judgment for "all economic, monetary, actual, consequential, and

compensatory damages" caused by defendants' conduct, and "if their conduct is proved willful"

then "exemplary damages" as well. (Complaint Ex. A at Prayer for Relief c); First Amended

Complaint Ex. B at Prayer For Relief c)) Damages sought include charges for content for which

class members did not consent (Complaint Ex. A at ¶ 63; First Amended Complaint Ex. B at ¶

65) and also "falsely inflated cellular service bills to their carriers as well as the time lost

required to sort, read, discard and attempt to prevent future charges for unwanted mobile content

services, and lost storage space, connectivity, and computer resources on their own cellular

phones." (Complaint Ex. A at ¶ 64; First Amended Complaint Ex. B at ¶ 66) Plaintiffs do not

limit their damages claims to any time period.

11.    Defendant denies that it has engaged in any wrongful conduct with regard to its

mobile content, that any of Plaintiffs' claims against it are valid, or that it owes anything to

Plaintiffs. However, the amount in controversy requirement looks not at defendants' positions

but at plaintiff class members' aggregated claims, and it is apparent from the nature and scope of

Plaintiffs' class claims and the scope of defendants' – and in particular mBlox's – operations

that the combined claims of all purported class members against all defendants greatly exceed

$5,000,000 million in compensatory damages alone, even before taking into account Plaintiffs'

claims for exemplary damages and attorneys' fees.

12.    This action involves allegedly improper charges for premium mobile phone (cell

phone) content, _i.e._, content for which the phone wireless subscriber pays an additional amount

above his or her standard monthly mobile phone charge. Such content is not, in the mobile

phone industry, limited to something as simple as a ringtone or game. According to Plaintiffs,

"[t]he burgeoning industry has already expanded from ordinary ringtones into mass media-

related products such as interactive radio and participatory voting at television and concert

1   events and, most recently, into services that enable cell phones to function as credit cards."

2   (Complaint Ex. A at ¶ 14; First Amended Complaint Ex. B at ¶ 16)

3          13.     The delivery of such content involves three layers: mobile content providers, like

4   Defendant, R&D Media North Americas B.V., who create the content; aggregators, like

5   defendant mBlox, Inc. ("mBlox"), who collect the content from providers, send it on to the

6   wireless carriers like AT&T Mobility, LLC ("AT&T") or Verizon Wireless ("Verizon"), and

7   provide wireless carriers with the monthly charges per user for such content; and wireless

8   carriers, who send the content on to their subscribers and include charges for the content in the

9   subscribers' bills. (van Drunen Dec. Ex. E at ¶¶ 3-4)

10         14.     Plaintiffs allege that this process contains a "disastrous flaw": "the authorization,

11  billing and collection systems established and/or propagated by companies are conspicuously

12  free of any checks or safeguards to prevent erroneous and unauthorized charges from being

13  added to customers' bills." (Complaint Ex. A at ¶ 11; First Amended Complaint Ex. B at ¶ 13).

14  According to Plaintiffs, once a mobile content provider has a cell phone number, it can give that

15  number to an aggregator, which instructs the wireless carrier to charge the bill of the wireless

16  subscriber with that number. "The charge will then appear on the consumer's cell phone bill,

17  often with only minimal, cryptic identifying information and rarely – if ever – containing the

18  identity of the affiliate marketer who purportedly retained the consent of the consumer"

19  (Complaint Ex. A at ¶ 16; First Amended Complaint Ex. B at ¶ 18).

20         15.     According to Plaintiffs, the adverse effects of this disastrous flaw on consumers

21  are enormous. Mobile content providers and affiliate marketers "have powerful financial

22  incentives to collect as many cell phone numbers as possible, but little incentive to ensure that

23  the owners of those numbers have truly agreed to purchase their goods and services."

24  (Complaint Ex. A at ¶ 17; First Amended Complaint EX. B at ¶ 19). Because no signatures or

25  private credit card numbers are necessary for a charge to be made, *the likelihood of false*

26  *charges increases enormously.* And, because a substantial part of mobile content 'sales' are

27  made through websites using misleading, oblique, or inadequately explained 'consent'

28

DEFENDANT R&D MEDIA NORTH AMERICAS B.V. d/b/a GLOMOBI's NOTICE OF REMOVAL
OF CIVIL ACTION  FROM STATE COURT [28 U.S.C. §§ 1332, 1441 (B), 1446 AND 1453]
B3659103.1

1   procedures increases, *that likelihood increases by another order of magnitude.*" Id. (emphasis
2   added).

3         16.    This action is one of dozens of lawsuits nationwide in which various plaintiffs
4   have brought purported class actions targeted at participants at each level of the mobile phone
5   content industry, including the leading wireless carriers and mobile content aggregators and
6   numerous mobile content providers. In this action, Plaintiffs brought suit against two mobile
7   content providers, Defendant and, for a time, AdMarvel, Inc., and the mobile content aggregator
8   mBlox. After their dismissal of AdMarvel, Inc., Plaintiffs now seek to represent two classes:

9         The Glomobi Class ("Glomobi Class") all wireless telephone subscribers worldwide who
10         suffered losses or damages as a result of Glomobi causing charges to be billed for mobile
11         content products and services not authorized by the subscriber (the "Class"); provided,
12         however, that the following are excluded from the Class: (i) Defendants, and (ii) any
13         employee of the Defendants.
14         The mBlox Class ("mBlox Class") all wireless telephone subscribers worldwide who
15         suffered losses or damages as a result of mBlox billing for mobile content products and
16         services not authorized by the subscriber (the "Class"); provided, however, that the
17         following are excluded from the Class: (i) Defendants, and (ii) any employee of the
18         Defendants.
19   (Complaint Ex. A at ¶ 52; First Amended Complaint Ex. B at ¶ 54)

20         17.    Although Defendant is a relatively small mobile content provider, defendant
21   mBlox is at an altogether different level of market participation. It is, according to its website,
22   the world's largest "mobile transaction network" (a term mBlox uses synonymously with
23   "mobile content aggregator"), enables businesses to deliver and bill for mobile services and
24   content around the world, specializes in global operator connectivity and mobile billing, and
25   maintain connections to more then 500 mobile operators in more than 180 countries.
26   (Declaration of Marc Temin ("Temin Dec.") attached as Exhibit F at ¶ 2) Reflecting the
27   "worldwide" class that Plaintiffs seek to represent, mBlox touts the global scope of its
28   operations: "Reaching more than 500 operators in over 180 countries, mBlox processes over 2.5

1   billion messages a year," with connectivity to more than two billion subscribers worldwide.

2   (Temin Dec. Ex. F at ¶ 3)

3        18.     Europe and the United States are a major focus of mBlox's operations. In

4   February 2006 mBlox, already the world's largest mobile transaction network, announced that it

5   had raised $25 million in additional capital, noting in a press release that "mBlox has secured

6   leadership in major markets including the United States and Europe, processing over 1bn mobile

7   business transactions worth approximately $400M in 2005." (Temin Dec. Ex. F at ¶ 4) An article

8   about mBlox's co-founder Andrew Bud asserted that, while mBlox was the world's largest

9   provider of mobile content transmission and billing services, it had a particular focus on Europe

10  and the US, and in 2008 it processed 2.5 billion mobile transactions, worth $500m. (Temin Dec.

11  Ex. F at ¶ 5)

12       19.     As alleged by the plaintiffs in another action against mBlox that is part of the

13  barrage of purported class actions based on alleged improper billing for mobile phone content,

14  "mBlox has developed a vast distribution system that integrates into the wireless networks of

15  some of the largest wireless carriers nationwide, providing direct connections to more than 500

16  mobile operators, including AT&T, Verizon, Cellular One, Spring Nextel, Alltel, US Cellular,

17  among many others. As a result, mBlox is able to reach and bill wireless subscribers

18  nationwide." (Complaint, ¶ 16, in *Walsh v. Mobile Messenger Americas, Inc. and mBlox, Inc.*,

19  Case No. BC385961 (Los Angeles Sup. Ct., filed February 21, 2008)).

20       20.     mBlox's central role in the delivery of mobile content nationwide is confirmed by

21  the numerous lawsuits related to this one in which mBlox is a defendant, including, among

22  others, a major case in Illinois, *Susan Paluzzi v. Cellco Partnership d/b/a Verizon Wireless,*

23  *mBlox, Inc., et al.*, No. 07 CH 37213 (Circuit Court of Cook County, IL.), and including, in

24  California alone; *Walsh v. Mobile Messenger Americas, Inc. and mBlox, Inc.*, No. BC385961

25  (Los Angeles Cnty. Sup. Ct.); *Louis Jiran, et al. v AT&T Mobility, LLC, Verisign, Inc., m-Qube,*

26  *Inc., mBlox, Inc., et al.* C-08-00013 (CW) (N.D. Cal.); *Russell Bradberry v. mBlox, Inc.*, No. C-

27  07-5298 (CW) (N.D. Cal.); *Borg v. Glispa, LLC, mBlox, Inc. and m-Qube, Inc.*, No. CGC 09-

28

1    485043 (San Francisco Cnty. Sup. Ct.); *Albrecht* v. *mBlox, Inc., Dada USA, Inc., Alltel*

2    *Communications, LLC;* No. 08-CV-121736 (Santa Clara Cnty. Sup. Ct.).

3          21.     Defendant receives revenue from mBlox only out of payments that mBlox

4    receives from the wireless carriers who have been paid by subscribers for Defendant's mobile

5    content, with the wireless carriers and mBlox each taking a prescribed percentage of the

6    subscribers' payments. (van Drunen Dec. Ex. E at ¶ 4) For the period February 2006 (when

7    mBlox began serving as Defendant's aggregator in the United States) through May 2009, the

8    payments received by Defendant from mBlox represented Defendant's prescribed percentage of

9    payments of more than $15,000,000 by subscribers in the United States. (van Drunen Dec. Ex. E

10    at ¶ 5). Defendant also provides mobile content to wireless subscribers in the United States

11    through another aggregator, m-Qube, Inc., and the Glomobi Class would include any of such

12    subscribers who have been billed without authorization for such content. (van Drunen Dec. Ex.

13    E at ¶ 3)

14          22.     However, the damages claimed by Plaintiffs on behalf of the Glomobi Class pale

15    beside those claimed on behalf of the mBlox class. Defendant has a relatively small portion of

16    the mobile content market in the United States, but, as the foregoing paragraphs show, mBlox

17    processes the mobile content of many other content providers, using numerous large wireless

18    carriers. Thus the $15,000,000 plus in charges represented by Defendants' content represents

19    only a small fraction of the subscriber charges that mBlox has billed. Indeed, the data cited

20    above about mBlox – its role as the world's largest mobile content aggregator, its processing of

21    more than 2.5 billion messages a year through more than 500 operators in over 180 countries, its

22    connectivity with more than 2 billion subscribers worldwide, its leading role in and focus on the

23    United States and Europe, and its processing of $500 million worth of transactions in 2008 alone

24    -- show that mBlox will doubtless have billed at least tens of millions of dollars per year in the

25    United States over the last few years, and probably hundreds of millions of dollars over the

26    unlimited period covered by Plaintiffs' claims.

27          21.     Plaintiffs do not contend, of course, that all these many millions of dollars were

28    charged without authorization. They do allege, however, that "Defendants and their industry

1  partners have intentionally created, maintained, and promoted a system that encourages fraud at

2  every step" (Complaint Ex. A at ¶ 35; First Amended Complaint Ex. B. at ¶ 37), that, because of

3  the "disastrous flaw" in the billing process "the likelihood of false charges increases

4  enormously," and that, given the alleged problems with mobile content sales and consent

5  procedures, that likelihood increases by another order of magnitude (Complaint Ex. A at ¶¶ 11,

6  17; First Amended Complaint Ex. B. at ¶¶ 13, 19), i.e., by a factor of ten.

7         22.    If this alleged enormous increase in the likelihood of false subscriber charges,

8  multiplied by ten, were to amount to only a ten percent chance of a false charge – a figure far

9  less than Plaintiffs' serious allegations import -- application of that percentage to aggregate

10  subscriber charges over $50,000,000 would result in Plaintiffs' claims exceeding $5,000,000.

11  Since it is apparent that mBlox has billed subscribers a great deal more than $50,000,000 over

12  the unlimited period covered by the Complaints, Plaintiffs' claims for compensatory damages

13  alone greatly exceed $5,000,000. The addition of Plaintiffs' claims for exemplary damages and

14  attorneys' fees pushes their claims still further over the threshold for removal under the Class

15  Action Fairness Act.

16         WHEREFORE, Defendant prays that the above-entitled action, currently pending in the

17  Stanislaus County Superior Court of California, be removed to the United States District Court

18  for the Eastern District of California, Fresno Division, and that this action proceed in this Court

19  as an action properly removed thereto.

20

21  DATED: August 14, 2009                    BURNHAM BROWN

22

23                                            By
                                                 ROBERT M. BODZIN
24                                            Attorneys for Defendant
                                              R&D MEDIA NORTH AMERICAS B.V. d/b/a
25                                            GLOMOBI, a Dutch Company

26  960394

27

28

---

9

EXHIBIT A

FILED

2009 JAN 15  PM 3:13

CLERK...

BY_____

RHONDA BLCS..._____ DEPUTY

1  Alan Himmelfarb (SBN 90480)
2  KAMBEREDELSON, LLC
   2757 Leonis Boulevard
3  Vernon, California 90058
   Telephone: (323) 585-8696
4
5  *Attorneys for Plaintiff*

6        SUPERIOR COURT OF THE STATE OF CALIFORNIA

7             FOR THE COUNTY OF STANISLAUS

8
9  WILLIAM PFROMMER and MICHAEL           )  Case No.   636593
   TURLOCK, individually and on behalf of a  )
10 class of similarly situated individuals,  )  CLASS ACTION COMPLAINT
                                           )  FOR:
11            Plaintiffs,                  )
                                           )  (1) Violation of Cal. Civ. Code §
12 v.                                      )      1770; and
                                           )  (2) Violation of Cal. Bus. &
13 R & D MEDIA NORTH AMERICAS B.V.         )      Prof. Code § 17200;
   D/B/A GLOMOBI, a Dutch company,         )  (3) Unjust Enrichment;
14 MBLOX, INC., a Delaware corporation,    )  (4) Trespass to Chattels; and
                                           )  (5) Tortious Interference with a
15            Defendants.                  )      Contract.
                                           )
16                                         )  DEMAND FOR JURY TRIAL
17                                         )

18                                                            BY FAX

19              CLASS ACTION COMPLAINT

20        Plaintiffs William Pfrommer and Michael Watson bring this class action complaint

21 against Defendants R & D Media North Americas BV and mBlox, Inc. seeking redress for

22 Defendants' unlawful practice of causing cellular telephone customers to be charged for

23 certain products and services the customers have not authorized. Plaintiffs, for their class

24 action complaint, allege as follows upon personal knowledge as to themselves and their own

25 acts and experiences, and, as to all other matters, upon information and belief, including

26 investigation conducted by their attorneys.

                             PARTIES

27    1.    Plaintiff William Pfrommer is a resident of Indiana.
28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

2.      Plaintiff Michael Watson is a resident of Stanislaus County, California.

3.      Defendant R & D Media North Americas BV d/b/a Glomobi ("Glomobi") is a provider of mobile content products and services such as ringtones. Glomobi is a corporation organized under the laws of The Netherlands and headquartered in Amsterdam. Glomobi did business throughout the State of California, the nation and the world.

4.      Defendant mBlox, Inc. ("mBlox") is an aggregator that distributes and bills mobile content consisting of, among other things, music ringtones, wallpapers, games, graphics, horoscopes, data, news, and other information transmitted or received via chat services (collectively, " mobile content"). mBlox is a Delaware corporation with its headquarters and principal place of business in Santa Clara County, California. It, through its parents, subsidiaries and/or affiliates, does business throughout the State of California, the nation and the world.

## JURISDICTION

5.      This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts.

6.      This Court has jurisdiction as a plaintiff resides in this County and the cause of action arose here.

## VENUE

7.      Venue is proper in this Court pursuant to Code of Civil Procedure because a Plaintiff resides in this county.

## CONDUCT COMPLAINED OF

8.      This case arises from three closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including—most significantly for present purposes—"premium" text message services. These services, also known as "mobile content," include products that range from the basic (customized ringtones for use with cell phones, sports

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
2

1  score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring

2  more advanced capabilities (such as direct payment services, interactive radio and

3  participatory television).

4      9.    The second underlying phenomenon of this case is that the method employed

5  throughout the industry to charge customers for mobile content services lacks necessary

6  safeguards. Just as providers of premium mobile content deliver their products by means of

7  cell phone technology, they likewise charge and collect from their customers by

8  "piggybacking" on the cell phone bills sent out by the wireless carriers. Further, because the

9  mobile content providers by themselves most often lack the wherewithal to negotiate the

10  necessary relationships with the much larger wireless carriers, they do so with the help of

11  third-party companies, known as aggregators. These aggregators act as middle-men,

12  representing numerous mobile content providers in arriving at agreements that allow these

13  mobile content providers to use the wireless carriers' billing and collection mechanisms. In

14  turn, both the aggregators, such as Defendant mBlox, and the wireless carriers are

15  compensated for their services by retaining a substantial percentage of the amount charged in

16  each premium mobile content transaction.

17      10.   The third underlying phenomenon of this case centers on the mechanism

18  mobile content providers utilize to attract and drive users to their websites to earn revenue.

19  Mobile content providers contract with affiliate marketers that provide a distribution platform

20  for mobile content providers' products and services. Affiliate marketers accumulate lists of

21  potential customers, primarily through websites they maintain on the internet, and pass these

22  lists onto mobile content providers. Many mobile content providers, including Defendant

23  Glomobi, request that affiliate marketers ensure that they obtain customers' consent prior to

24  sending on the customers' information. However, many affiliate marketers fail to obtain

25  such consent and fail to accurately and clearly disclose in their advertisements important

26  information about these products and services—such as the price of the products and

27  services, the subscription period, and/or the cancellation procedures—prior to causing the

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

3

1    billing process to occur. Through these deceptive marketing practices, many consumers are

2    improperly charged for products and services that they did not agree to purchase.

3              11.    The rapid and largely unplanned growth of the premium mobile content

4    industry has led both to the above-described structure of the industry and to a disastrous flaw

5    within it. That flaw—understood, perpetuated, and even encouraged by carriers, aggregators,

6    mobile content providers, and affiliate marketers— is an open secret within the industry, but

7    little understood outside of it. In short, the authorization, billing and collection systems

8    established and/or propagated by companies are conspicuously free of any checks or

9    safeguards to prevent erroneous and unauthorized charges from being added to customers'

10   bills.

11             12.    Affiliate marketers exploit this flaw by marketing content that is sold through

12   the carriers' mobile commerce applications installed on consumers' cellular telephones

13   (commonly referred to as "on-portal" or "on-deck" transactions), and/or through a variety of

14   other mediums such as television, radio, and non-mobile Internet websites (collectively

15   known as "off-portal" or "off-deck" transactions).

16             13.    As Defendants also know, significant amounts of money have been collected

17   on account of such unauthorized charges for premium mobile content in the industry over the

18   last few years. And, while it has always been within the power of companies to institute

19   simple and effective measures that would prevent this, they have instead knowingly

20   maintained the very system that has allowed these erroneous charges.

21             14.    While the total sales in California and the nation of premium mobile content

22   in 2008 amount to a significant sum, the business is still in its infancy. The burgeoning

23   industry has already expanded from ordinary ringtones into mass media-related products

24   such as interactive radio and participatory voting at television and concert events and, most

25   recently, into services that enable cell phones to function as credit cards. Unchecked,

26   Defendants' practices will injure an ever-increasing number of unwitting consumers,

27   inflicting damages of an untold magnitude.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4

### Glomobi's Role in the Scheme to Defraud

15.   Unlike transactions made using checks and credit cards, which require a signature or a highly private sixteen-digit credit card number, the only information a mobile content provider needs to charge a consumer for mobile content is the consumer's cellular telephone number.  Once a mobile content provider receives a consumer's cell phone number from an affiliate marketer, the mobile content provider continues a process that causes that consumer to be billed for services and products irrespective of whether the consumer actually knowingly consented to purchase them.

16.   Armed with only a cell phone number, the mobile content provider can then simply provide that number, along with an amount to be charged, to a billing aggregator. The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill associated with that cellular phone number.  The charge will then appear on the consumer's cell phone bill, often with only minimal, cryptic identifying information, and rarely—if ever—containing the identity of the affiliate marketer who purportedly retained the consent of the consumer.

17.   Because the protections normally present in consumer transactions—such as signatures and private credit card numbers—are absent from this process, the likelihood of false charges increases enormously.  And, because a substantial part of mobile content "sales" are made through websites using misleading, oblique, or inadequately explained "consent" procedures, that likelihood increases by another order of magnitude.  Mobile content providers such as Defendant and affiliate marketers have powerful financial incentives to collect as many cell phone numbers as possible, but little incentive to ensure that the owners of those numbers have truly agreed to purchase their goods and services.

### mBlox's Role in the Scheme to Defraud

18.   In order to tap into the emerging mobile content marketplace, affiliate marketers provide advertising services for mobile content providers, such as the Glomobi, who have obtained access to wireless carriers' mobile communications networks through

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

5

1   third-parties known as aggregators.  Aggregators such as mBlox are intermediary companies

2   that offer mobile-content providers and affiliate marketers direct access to the carriers

3   through their existing relationships.  Affiliate marketers focus on marketing mobile content

4   developed by content providers, while aggregators manage the complex carrier relationships,

5   distribution, billing, and customer service.

6       19.     Aggregators operate mobile transaction networks that help companies

7   develop, deliver, and bill for mobile content services to compatible mobile devices

8   throughout the State of California and the nation.

9       20.     While aggregators charge mobile content providers some upfront fees, their

10  revenue is primarily generated through a "revenue share" on transactions that are billed to

11  cell phone subscribers.  Each time a charge is incurred in connection with the purchase of

12  mobile content services, the aggregator causes said charge to be billed directly on the cellular

13  telephone bill of the carrier's customer whose cell phone number is (claimed to be)

14  associated with said purchase.

15      21.     Aggregators have forged a crucial link between the wireless carriers and

16  mobile content providers by using their end-to-end technology platforms, their relationships

17  with wireless carriers, and other value-added services.  They have enabled the transformation

18  of wireless technology into a marketing, content delivery, and collections process, while

19  carving out a profitable role for themselves as very critical middlemen in this rapidly

20  growing industry.

21      22.     The carrier then bills and collects the charge from its current subscriber,

22  retains a portion of the proceeds as its "revenue share" and then remits the balance to the

23  aggregator who retains a percentage of the balance in the form of its own "revenue share."

24  The aggregator then remits the remainder directly to the mobile content provider, who then

25  remits payment in a fixed amount of revenue share to the appropriate affiliate marketer.

26      23.     In the United States, aggregators have registered numerous transactions and

27  processed significant amounts of money over recent years.  Aggregators have profited greatly

28  COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6

1 | from their arrangement with industry partners, including Glomobi.

2 | Copyright Licensor's Role in the Scheme to Defraud

3 | 24.    Since the advent of customized cellular telephone ringtones, the demand for

4 | mobile content based on copyrighted music has grown exponentially and today accounts for

5 | a significant percentage of all mobile content providers' revenue.  In order to tap into such

6 | demand, mobile content providers must first obtain permission from the copyright owners of

7 | the music that is to be sold in the form of ringtones.

8 | 25.    Owners of copyrighted music, such as Universal Music Group, Inc., among

9 | many others, have licensed parts of their libraries of copyrighted music to numerous mobile

10 | content providers for the latter to sell to consumers in the form of ringtones. This

11 | arrangement allows content providers to focus on developing the mobile content based on the

12 | copyrighted music while allowing the copyright owners to remain silent partners operating

13 | primarily in the background.

14 | 26.    While copyright owners are ordinarily compensated by their content provider

15 | partners through upfront fees, their revenue is frequently generated through a "revenue

16 | share" or "equity share" based on mobile content transactions involving their copyrighted

17 | material: each time a charge is incurred in connection with the purchase of their copyrighted

18 | mobile content, the copyright licensor's industry partners described above cause that charge

19 | to be billed directly on the cellular telephone bill of the carrier's customer who currently

20 | owns and/or uses the telephone number (claimed to be) associated with said purchase.

21 | 27.    Licensors have, in California and throughout the nation, registered numerous

22 | transactions and processed significant amounts of money over recent years, profiting greatly

23 | from their arrangements with industry partners.

24 | 28.    Licensors have not only sanctioned illegal billing, they have actively

25 | promoted it by negotiating and facilitating partnerships with mobile content providers, and

26 | by failing to maintain adequate safeguards to prevent unauthorized charges.  Despite their

27 | knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to

28 |

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

7

1    collect revenue for the sale of unauthorized mobile content.

2                    **Affiliate Marketer's Role in the Scheme to Defraud**

3           29.    Affiliate marketers, such as Glispa, are Internet advertising networks that

4    provide a distribution platform for mobile content providers' products and services.

5           30.    Advertising is an essential element in the mobile content industry. Without

6    the ability to drive users to their websites, mobile content providers, aggregators, and others

7    up the profit chain would be virtually unable to earn any revenue. Absent advertising

8    through affiliate marketers, mobile content providers and aggregators would have

9    significantly fewer visitors to their websites and their illegal revenues would drop

10   dramatically.

11          31.    Many affiliate marketers with whom mobile content providers contract fail to

12   clearly and accurately disclose a host of highly relevant information to consumers about

13   purchasing mobile content, such as the price of the services, the subscription period, and the

14   cancellation procedures, among others.

15          32.    Indeed, many affiliate marketers, specifically employ anti-consumer practices

16   simply to achieve the next "sale." For example, many affiliate marketers employ a so-called

17   "negative option" gambit, which involves the practice of presenting a consumer with the

18   opportunity to consent in advance in order to continue to receive products or services in the

19   future until the consumer cancels such service. In such situations, the seller frequently

20   interprets the consumer's silence or failure to take an affirmative action to reject goods or

21   services, or to cancel the sales agreement, as an agreement or consent to continue receiving

22   the offer, when in fact the consumer intends just the opposite.

23          33.    Affiliate marketers are loath to adequately disclose the relevant information

24   about purchasing mobile content for fear of scaring off potential "customers." Deceptive

25   affiliate marketers have systematically declined to comply with the requirements imposed by

26   content providers and others, which require affiliate marketers to obtain consumers' actual

27   consent prior to causing such consumers to be billed.

28

     COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

                                          8

34.    Indeed, if Defendants wanted to end this illegal billing, it could do so in an instant. All it would have to do to ensure that it obtains the consent of the charged parties is agree, with its industry partners, to require a customer to provide an "access code," which can be provided by the wireless carrier to the account holder at the time the wireless account is opened. In turn, the carrier and aggregators can require that this access code be produced anytime an affiliate marketer attempts to apply a mobile content charge to a consumer's cell phone account. If a matching access code is not provided, no charges would be processed to the customer's billing statement.

35.    Instead of implementing such a simple safeguard, Defendants and its industry partners have intentionally created, maintained, and promoted a system that encourages fraud at every step.

36.    Defendants' conduct is by no means accidental. As previously alleged, Defendants know that many consumers have disputed and continue to dispute claims that they consented to be charged for mobile content services. Defendants further know that it cannot authenticate those consumers' authority to be billed. In light of this knowledge, Defendants decision to continue to cause consumers to be charged for mobile content without taking steps to authenticate the consumers' authorization constitutes a deliberate and willful scheme to cheat large numbers of people out of small amounts of money.

37.    Because the amount Defendants are taking is small on an individual basis—as little as a few dollars to at most several hundreds of dollars per person—Defendants employ this scheme with the hope and expectation that its illegal conduct will go unpunished.

## THE FACTS RELATING TO NAMED PLAINTIFF PFROMMER

38.    In or about 2005, Plaintiff obtained cell phone service from an authorized sales representative of an established wireless carrier.

39.    On that same day, in exchange for a cellular telephone service plan, Plaintiff agreed to pay his wireless carrier a set fee for a period of several months.

40.    In or about 2008, Plaintiff's cell phone account was charged for unwanted

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

9

1  mobile content services by Defendants.

2      41.   At no time did Plaintiff authorize the purchase of these products and services

3  provided and/or marketed by Defendants.

4      42.   During the relevant time period, Defendants caused Plaintiff to be charged

5  service fees in the amount of several dollars for such mobile content charges.

6      43.   At no time did Plaintiff authorize Defendants or anyone else to bill him for

7  these charges and at no time did Defendants or anyone else verify Plaintiff's purported

8  authorization of these charges.

9      44.   Neither Defendants nor their industry partners have provided Plaintiff with a

10  full refund of the unauthorized charges consisting of the premium text message charges,

11  ordinary text messages, data charges, back interest, implement adequate procedures to ensure

12  that such unauthorized charges would not appear in future billing periods and/or an assurance

13  that such unauthorized charges would not appear in future billing periods.

14              **THE FACTS RELATING TO NAMED PLAINTIFF WATSON**

15      45.   In or about 2006, Plaintiff obtained cell phone service from an authorized

16  sales representative of an established wireless carrier.

17      46.   On that same day, in exchange for a cellular telephone service plan, Plaintiff

18  agreed to pay his wireless carrier a set fee for a period of several months.

19      47.   In or about 2007, Plaintiff's cell phone account was charged for unwanted

20  mobile content services by Defendants.

21      48.   At no time did Plaintiff authorize the purchase of these products and services

22  provided and/or marketed by Defendants.

23      49.   During the relevant time period, Defendants caused Plaintiff to be charged

24  service fees in the amount of several dollars for such mobile content charges.

25      50.   At no time did Plaintiff authorize Defendants or anyone else to bill him for

26  these charges and at no time did Defendants or anyone else verify Plaintiff's purported

27  authorization of these charges.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
10

1    51.    Neither Defendants nor their industry partners have provided Plaintiff with a

2  full refund of the unauthorized charges consisting of the premium text message charges,

3  ordinary text messages, data charges, back interest, implement adequate procedures to ensure

4  that such unauthorized charges would not appear in future billing periods and/or an assurance

5  that such unauthorized charges would not appear in future billing periods.

6

7                          CLASS ALLEGATIONS

8    52.    Plaintiffs bring this action, pursuant to Code of Civil Procedure § 382, on

9  behalf of themselves and two classes:

10    i)    The Glomobi Class ("Glomobi Class") all wireless telephone subscribers

11          worldwide who suffered losses or damages as a result of Glomobi causing

12          charges to be billed for mobile content products and services not authorized

13          by the subscriber (the "Class"); provided, however, that the following are

14          excluded from the Class: (i) Defendants, and (ii) any employee of the

15          Defendants.

16    ii)   The mBlox Class ("mBlox Class") all wireless telephone subscribers

17          worldwide who suffered losses or damages as a result of mBlox billing for

18          mobile content products and services not authorized by the subscriber (the

19          "Class"); provided, however, that the following are excluded from the Class:

20          (i) Defendants, and (ii) any employee of the Defendants.

21    53.    The Classes consists of thousands of individuals and other entities, making

22  joinder impractical, in satisfaction of Code of Civil Procedure § 382.

23    54.    The claims of Plaintiffs are typical of the claims of all of the other members of

24  the Classes.

25    55.    Plaintiffs will fairly and adequately represent and protect the interests of the

26  other members of the Classes.  Plaintiffs have retained counsel with substantial experience in

27  prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

11

1   to vigorously prosecuting this action on behalf of the members of the Classes, and have the
2   financial resources to do so.  Neither Plaintiff nor their counsel have any interest adverse to
3   those of the other members of the Classes.

4       56.     Absent a class action, most members of the Classes would find the cost of
5   litigating their claims to be prohibitive, and will have no effective remedy.  The class
6   treatment of common questions of law and fact is also superior to multiple individual actions
7   or piecemeal litigation in that it conserves the resources of the courts and the litigants, and
8   promotes consistency and efficiency of adjudication.

9       57.     Defendants have acted and failed to act on grounds generally applicable to the
10  Plaintiffs and the other members of the Classes, requiring the Court's imposition of uniform
11  relief to ensure compatible standards of conduct toward the members of the Classes.

12      58.     The factual and legal bases of Defendants' liability to Plaintiffs and to the
13  other members of the Classes are the same, resulting in injury to the Plaintiffs and to all of
14  the other members of the Classes.  Plaintiffs and the other members of the Classes have all
15  suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

16      59.     There are many questions of law and fact common to the claims of Plaintiffs
17  and the other members of the Classes, and those questions predominate over any questions
18  that may affect individual members of the Class.

19      60.     Common questions for the Classes include but are not limited to the
20  following:

21          (a)     Whether Defendants have unjustly received money belonging to
22  Plaintiffs and the respective Classes and whether under principles of equity and good
23  conscience, Defendants should not be permitted to retain it;

24          (b)     Whether Defendants tortiously interfered with contracts between
25  Plaintiffs and the respective Classes, on the one hand, and their wireless carriers, on
26  the other hand, by causing them to be charged for products and services by their
27  carriers that were unauthorized; and

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
12

(c)    Whether Defendants' conduct described herein violates California

Business and Professions Code sections 17200, *et seq*;

## COUNT I

### (Violation of the California Consumer Legal Remedies Act ("CLRA"),
### Cal. Civ. Code § 1770 on behalf of the Classes)

61.    Plaintiffs incorporate by reference the foregoing allegations.

62.    The mobile content services that are the subject of this complaint are services for other than a commercial or business use, as described in Cal. Civ. Code § 1761(b). The mobile content services are used for personal, family, or household purposes, and mobile content service subscribers are consumers under the definition in Cal. Civ. Code § 1761(d). Plaintiffs and the other members of the Class use the wireless services acquired from wireless carriers for personal, family, or household purposes, and are consumers under the definition in Cal. Civ. Code § 1761(d).

63.    Defendants misrepresent the approval for, characteristics of, and the obligations associated with the mobile content services when they transmit billing instructions to aggregators, carriers and other entities for mobile content services to Plaintiffs and the other members of the Classes, which indicate that the mobile content services and the correspondingly charges for those services were approved. These bills cause the Plaintiffs and the other class members to pay charges for mobile content services to which they did not consent, and violate Cal. Civ. Code § 1770(a)(2), (5), (14).

64.    Collectively, these CLRA violations have damaged the Plaintiffs and other members of the Classes by causing them to pay falsely inflated cellular service bills to their carriers as well as the lost time required to sort, read, discard and attempt to prevent future charges for unwanted mobile content services, and lost storage space, connectivity, and computing resources on their cellular phones.

65.    Plaintiffs, on their own behalf and behalf of the other members of the Classes, seek an order enjoining Defendants' CLRA violations alleged herein and the imposition of a

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13

1   constructive trust on and restitution of property gained by the CLRA violations, and court

2   costs and attorney's fees under the CLRA (Cal. Civ. Code § 1780(d)).

<div align="center">COUNT II</div>

<div align="center">(Violation of California's Unfair Competition Law ("UCL"),</div>

<div align="center">Cal. Bus. & Prof. Code § 17200 on behalf of the Classes)</div>

6      66.    Plaintiffs incorporate by reference the foregoing allegations.

7      67.    Defendants' communications to mobile content providers, aggregators,

8   carriers and/or others falsely state that Plaintiffs and the other members of the Classes have

9   approved, authorized, and/or consented to charges for mobile content services, and are

10  deceptive and unfair. Further, Defendants' communications are unlawful because they

11  violate the CLRA, CFAA, and/or the FCA.

12     68.    The acts alleged above are unlawful, unfair or fraudulent business acts or

13  practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

14     69.    Plaintiffs, on their own behalf and behalf of the other class members, seek an

15  order enjoining Defendants' unfair competition alleged herein, and the imposition of a

16  constructive trust on and restitution of property gained by such unfair competition under the

17  UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorney's fees and costs

18  pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

19

<div align="center">COUNT III</div>

<div align="center">(Restitution/Unjust Enrichment on behalf of both Classes)</div>

22     70.    Plaintiffs incorporate by reference the foregoing allegations.

23     71.    A benefit has been conferred upon Defendants by Plaintiffs and the members

24  of the Classes. Defendants have received and retain money belonging to Plaintiffs and the

25  other members of the Classes resulting from their participation in the billing process and

26  receipt significant amounts of money in unauthorized mobile content charges.

27     72.    Defendants appreciate or have knowledge of said benefit.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

<div align="center">14</div>

73.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and the members of the Classes that they have unjustly received as a result of their actions.

74.    Plaintiffs and the members of the Classes have suffered loss as a direct result of Defendants' conduct.

75.    Plaintiffs, on their own behalf and behalf of the other class members, seek the imposition of a constructive trust on and restitution of the proceeds from the unauthorized charges Defendants have received, as well as attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

## COUNT IV

### (Trespass to Chattels on behalf of both Classes)

76.    Plaintiffs incorporate by reference the foregoing allegations.

77.    Defendants and/or their agents intentionally and without consent, transmitted mobile content to Plaintiffs' cellular phone and the wireless devices of the members of the Classes.

78.    In the course of transmitting mobile content to these wireless devices, Defendants and/or their agents intentionally and without consent, gained access to these devices, used these devices, occupied the memory of these devices, and/or dispossessed Plaintiffs and the members of the Classes of unencumbered access to their wireless devices.

79.    Plaintiffs own, possess, and use their cellular phone.  Likewise, the members of the Classes own, possess, and use the wireless devices to which Defendants transmitted or caused to be transmitted mobile content. These wireless devices are the personal property of the members of the Classes.

80.    In so doing, Defendants intentionally intermeddled with, damaged, and deprived Plaintiffs and the members of the Classes of their wireless handsets, or a portion thereof. This damage included, but was not limited to, the unauthorized charges for mobile content, which Defendants obliged Plaintiffs and the other members of the Classes to pay.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1 | Defendants trespassed on the chattels of Plaintiffs and the other members of the Class.

2 | 81. Plaintiffs, on their own behalf and behalf of the other members of the

3 | respective Class, seek damages from Defendants' trespass, as well as attorney's fees and

4 | costs pursuant to Cal. Code Civ. Proc. § 1021.5.

5 | <center>COUNT V</center>

6 | <center>(Tortious Interference with a Contract on</center>

7 | <center>behalf of the Classes)</center>

8 | 82. Plaintiffs incorporate by reference the foregoing allegations.

9 | 83. Plaintiffs and the other members of the Classes had contractual relationships

10 | with their wireless carriers whereby they agreed to pay a certain sum of money in exchange

11 | for activation of their cellular telephone accounts and their carriers' promise to provide

12 | various communication and related services and to bill Plaintiffs and the members of the

13 | Classes only for those products or services the purchase of which they had authorized.

14 | 84. Defendants knew of said contractual relationships and intended to and did

15 | induce a breach or disruption of the contractual relationships.

16 | 85. Defendants intentionally interfered with said contractual relationships through

17 | improper motives and/or means by knowingly and/or recklessly continually causing to be

18 | placed on the cellular telephone bills of cellular telephone owners across the nation

19 | unauthorized charges.

20 | 86. Plaintiffs and the other members of the Classes suffered loss as a direct result

21 | of the Defendants' conduct.

22 | 87. Plaintiffs, on their own behalf and behalf of the other class members, seek

23 | damages from Defendants' tortious interference, as well as attorney's fees and costs pursuant

24 | to Cal. Code Civ. Proc. § 1021.5.

25 | <center>PRAYER FOR RELIEF</center>

26 | WHEREFORE, Plaintiffs William Pfrommer and Michael Watson, on behalf of

27 | themselves and the Classes, prays for the following relief:

28 |

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

<center>16</center>

a) Certify this case as a class action on behalf of the Classes defined above and appoint William Pfrommer and Michael Turlock as representatives of the Classes, and appoint the undersigned as lead counsel;

b) Declare that the actions of Defendants, as set out above, constitute unjust enrichment, trespass to chattels, and tortious interference with a contract, violate Cal. Civ. Code § 1770 and Cal. Bus. & Prof. Code § 17200;

c) Enter judgment against Defendants for all economic, monetary, actual, consequential, and compensatory damages caused by their conduct, and if their conduct is proved willful, award Plaintiffs and the Classes exemplary damages (for the sake of clarity, Plaintiffs explicitly disclaim any claim for damages under the CLRA at this time);

d) Award Plaintiffs and the Classes reasonable costs and attorneys' fees;

e) Award Plaintiffs and the Classes pre- and post-judgment interest;

f) Enter judgment for injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

g) Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiffs request trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: January 15, 2009                    KAMBEREDELSON, LLC

By: _____
ALAN HIMMELFARB
One of the Attorneys for WILLIAM
PFROMMER and MICHAEL
TURLOCK, individually and on behalf
of Class of similarly situated individuals

Alan Himmelfarb (SBN 90480)
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

17

**EXHIBIT B**

FILED

2009 JUN -8 PM 2: 36

CLERK OF THE SUPERIOR COURT
COUNTY OF STANISLAUS

BY
KIMBERLY A.F. SCOTT
DEPUTY

1  Alan Himmelfarb (SBN 90480)
   KAMBEREDELSON, LLC
2  2757 Leonis Boulevard
   Vernon, California 90058
3  Telephone: (323) 585-8696

4

5  *Attorneys for Plaintiff*

6          SUPERIOR COURT OF THE STATE OF CALIFORNIA

7              FOR THE COUNTY OF STANISLAUS

8

9  WILLIAM PFROMMER and MICHAEL     ) Case No. 636543
   WATSON, individually and on behalf of a  )
10 class of similarly situated individuals,  ) FIRST AMENDED CLASS
                                    ) ACTION COMPLAINT FOR:
11          Plaintiffs,              )
                                    )   (1) Violation of Cal. Civ. Code §
12 v.                               )       1770; and
                                    )   (2) Violation of Cal. Bus. &
13 R & D MEDIA NORTH AMERICAS B.V.  )       Prof. Code § 17200
   D/B/A GLOMOBI, a Dutch company,  )   (3) Unjust Enrichment;
14 MBLOX, INC., a Delaware corporation, )   (4) Trespass to Chattels; and
   ADMARVEL, INC. A/K/A FRENGO      )   (5) Tortious Interference with a
15 CORPORATION, a Delaware corporation, )       Contract.
                                    )                    BY FAX
16          Defendants.             )
                                    ) DEMAND FOR JURY TRIAL
17                                  )

18

19              CLASS ACTION COMPLAINT

20      Plaintiffs William Pfrommer and Michael Watson bring this first amended class

21 action complaint against Defendants R & D Media North Americas BV, mBlox, Inc. and

22 AdMarvel, Inc. a/k/a Frengo Corporation seeking redress for Defendants' unlawful practice

23 of causing cellular telephone customers to be charged for certain products and services the

24 customers have not authorized. Plaintiffs, for their class action complaint, allege as follows

25 upon personal knowledge as to themselves and their own acts and experiences, and, as to all

26 other matters, upon information and belief, including investigation conducted by their

27 attorneys.

28

FIRST AMENDED COMPLAINT

1                                    **PARTIES**

2        1.      Plaintiff William Pfrommer is a resident of Indiana.

3        2.      Plaintiff Michael Watson is a resident of Stanislaus County, California.

4        3.      Defendant R & D Media North Americas BV d/b/a Glomobi ("Glomobi") is a

5    provider of mobile content products and services such as ringtones. Glomobi is a corporation

6    organized under the laws of The Netherlands and headquartered in Amsterdam. Glomobi did

7    business throughout the State of California, the nation and the world.

8        4.      Defendant mBlox, Inc. ("mBlox") is an aggregator that distributes and bills

9    mobile content consisting of, among other things, music ringtones, wallpapers, games,

10   graphics, horoscopes, data, news, and other information transmitted or received via chat

11   services (collectively, " mobile content"). mBlox is a Delaware corporation with its

12   headquarters and principal place of business in Santa Clara County, California. It, through its

13   parents, subsidiaries and/or affiliates, does business throughout the State of California, the

14   nation and the world.

15       5.      Defendant AdMarvel, Inc. a/k/a Frengo Corporation ("Frengo") is a provider

16   of mobile content products and services such as ringtones. Frengo is a corporation organized

17   under the laws of Delaware and headquartered in California. Frengo does business

18   throughout the State of California, the nation and the world.

19                                  **JURISDICTION**

20       6.      This Court has jurisdiction over the causes of action asserted herein pursuant

21   to the California Constitution, Article VI, §10, because this case is a cause not given by

22   statute to other trial courts.

23       7.      This Court has jurisdiction as a Plaintiff resides in this County and the cause

24   action arose here.

25                                     **VENUE**

26       8.      Venue is proper in this Court pursuant to Code of Civil Procedure because a

27   Plaintiff resides in this county.

28   **FIRST AMENDED COMPLAINT**
                                         2

1    **CONDUCT COMPLAINED OF**

2         9.    This case arises from three closely related phenomena.  The first is the

3    capability of most cellular telephones, not only to make and receive telephone calls, but also

4    to send and receive text messages, including—most significantly for present purposes—

5    "premium" text message services.  These services, also known as "mobile content," include

6    products that range from the basic (customized ringtones for use with cell phones, sports

7    score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring

8    more advanced capabilities (such as direct payment services, interactive radio and

9    participatory television).

10        10.    The second underlying phenomenon of this case is that the method employed

11   throughout the industry to charge customers for mobile content services lacks necessary

12   safeguards.  Just as providers of premium mobile content deliver their products by means of

13   cell phone technology, they likewise charge and collect from their customers by

14   "piggybacking" on the cell phone bills sent out by the wireless carriers.  Further, because the

15   mobile content providers by themselves most often lack the wherewithal to negotiate the

16   necessary relationships with the much larger wireless carriers, they do so with the help of

17   third-party companies, known as aggregators.  These aggregators act as middle-men,

18   representing numerous mobile content providers in arriving at agreements that allow these

19   mobile content providers to use the wireless carriers' billing and collection mechanisms.  In

20   turn, both the aggregators, such as Defendant mBlox, and the wireless carriers are

21   compensated for their services by retaining a substantial percentage of the amount charged in

22   each premium mobile content transaction.

23        11.    The rapid and largely unplanned growth of the premium mobile content

24   industry has led both to the above-described structure and to a disastrous flaw within it.  That

25   flaw is an open secret within the industry, but little understood outside of it.  In short, the

26   billing and collection systems established and/or propagated by companies including

27   Defendants in aid of the premium mobile content industry that enriches them are

28   **FIRST AMENDED COMPLAINT**

1 │ conspicuously free of any checks or safeguards to prevent erroneous and unauthorized

2 │ charges from being added to customers' bills.

3 │       12.     The third underlying phenomenon of this case centers on the mechanism

4 │ mobile content providers utilize to attract and drive users to their websites to earn revenue.

5 │ Mobile content providers contract with affiliate marketers that provide a distribution platform

6 │ for mobile content providers' products and services.  Affiliate marketers accumulate lists of

7 │ potential customers, primarily through websites they maintain on the internet, and pass these

8 │ lists onto mobile content providers.  Many mobile content providers, including Defendants

9 │ Frengo and Glomobi, request that affiliate marketers ensure that they obtain customers'

10 │ consent prior to sending on the customers' information.  However, many affiliate marketers,

11 │ fail to obtain such consent and fail to accurately and clearly disclose in their advertisements

12 │ important information about these products and services—such as the price of the products

13 │ and services, the subscription period, and/or the cancellation procedures—prior to causing

14 │ the billing process to occur.  Through these deceptive marketing practices, many consumers

15 │ are improperly charged for products and services that they did not agree to purchase.

16 │       13.     The rapid and largely unplanned growth of the premium mobile content

17 │ industry has led both to the above-described structure of the industry and to a disastrous flaw

18 │ within it.  That flaw—understood, perpetuated, and even encouraged by carriers, aggregators,

19 │ mobile content providers, and affiliate marketers—is an open secret within the industry, but

20 │ little understood outside of it.  In short, the authorization, billing and collection systems

21 │ established and/or propagated by companies are conspicuously free of any checks or

22 │ safeguards to prevent erroneous and unauthorized charges from being added to customers'

23 │ bills.

24 │       14.     Affiliate marketers exploit this flaw by marketing content that is sold through

25 │ the carriers' mobile commerce applications installed on consumers' cellular telephones

26 │ (commonly referred to as "on-portal" or "on-deck" transactions), and/or through a variety of

27 │ other mediums such as television, radio, and non-mobile Internet websites (collectively

28 │

**FIRST AMENDED COMPLAINT**

1    known as "off-portal" or "off-deck" transactions).

2        15.     As Defendants also know, significant amounts of money have been collected

3    on account of such unauthorized charges for premium mobile content in the industry over the

4    last few years. And, while it has always been within the power of companies to institute

5    simple and effective measures that would prevent this, they have instead knowingly

6    maintained the very system that has allowed these erroneous charges.

7        16.     While the total sales in California and the nation of premium mobile content

8    in 2008 amount to a significant sum, the business is still in its infancy. The burgeoning

9    industry has already expanded from ordinary ringtones into mass media-related products

10    such as interactive radio and participatory voting at television and concert events and, most

11    recently, into services that enable cell phones to function as credit cards. Unchecked,

12    Defendants' practices will injure an ever-increasing number of unwitting consumers,

13    inflicting damages of an untold magnitude.

14        **Glomobi and Frengo's Role in the Scheme to Defraud**

15        17.     Unlike transactions made using checks and credit cards, which require a

16    signature or a highly private sixteen-digit credit card number, the only information a mobile

17    content provider needs to charge a consumer for mobile content is the consumer's cellular

18    telephone number. Once a mobile content provider receives a consumer's cell phone number

19    from an affiliate marketer, the mobile content provider continues a process that causes that

20    consumer to be billed for services and products irrespective of whether the consumer actually

21    knowingly consented to purchase them.

22        18.     Armed with only a cell phone number, the mobile content provider can then

23    simply provide that number, along with an amount to be charged, to a billing aggregator.

24    The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill

25    associated with that cellular phone number. The charge will then appear on the consumer's

26    cell phone bill, often with only minimal, cryptic identifying information, and rarely—if

27    ever—containing the identity of the affiliate marketer who purportedly retained the consent

28

**FIRST AMENDED COMPLAINT**

1   of the consumer.

2       19.    Because the protections normally present in consumer transactions—such as

3   signatures and private credit card numbers—are absent from this process, the likelihood of

4   false charges increases enormously. And, because a substantial part of mobile content

5   "sales" are made through websites using misleading, oblique, or inadequately explained

6   "consent" procedures, that likelihood increases by another order of magnitude. Mobile

7   content providers such as Defendant and affiliate marketers have powerful financial

8   incentives to collect as many cell phone numbers as possible, but little incentive to ensure

9   that the owners of those numbers have truly agreed to purchase their goods and services.

10                     **mBlox's Role in the Scheme to Defraud**

11       20.    In order to tap into the emerging mobile content marketplace, affiliate

12   marketers provide advertising services for mobile content providers, such as the Glomobi and

13   Frengo, who have obtained access to wireless carriers' mobile communications networks

14   through third-parties known as aggregators. Aggregators such as mBlox are intermediary

15   companies that offer mobile content providers and affiliate marketers direct access to the

16   carriers through their existing relationships. Affiliate marketers focus on marketing mobile

17   content developed by content providers, while aggregators manage the complex carrier

18   relationships, distribution, billing, and customer service.

19       21.    Aggregators operate mobile transaction networks that help companies

20   develop, deliver, and bill for mobile content services to compatible mobile devices

21   throughout the State of California and the nation.

22       22.    While aggregators charge mobile content providers some upfront fees, their

23   revenue is primarily generated through a "revenue share" on transactions that are billed to

24   cell phone subscribers. Each time a charge is incurred in connection with the purchase of

25   mobile content services, the aggregator causes said charge to be billed directly on the cellular

26   telephone bill of the carrier's customer whose cell phone number is (claimed to be)

27   associated with said purchase.

28   **FIRST AMENDED COMPLAINT**

1       23.     Aggregators have forged a crucial link between the wireless carriers and

2   mobile content providers by using their end-to-end technology platforms, their relationships

3   with wireless carriers, and other value-added services.  They have enabled the transformation

4   of wireless technology into a marketing, content delivery, and collections process, while

5   carving out a profitable role for themselves as very critical middlemen in this rapidly

6   growing industry.

7       24.     The carrier then bills and collects the charge from its current subscriber,

8   retains a portion of the proceeds as its "revenue share" and then remits the balance to the

9   aggregator who retains a percentage of the balance in the form of its own "revenue share."

10  The aggregator then remits the remainder directly to the mobile content provider, who then

11  remits payment in a fixed amount of revenue share to the appropriate affiliate marketer.

12      25.     In the United States, aggregators have registered numerous transactions and

13  processed significant amounts of money over recent years.  Aggregators have profited greatly

14  from their arrangement with industry partners, including Glomobi and Frengo.

15              **Copyright Licensor's Role in the Scheme to Defraud**

16      26.     Since the advent of customized cellular telephone ringtones, the demand for

17  mobile content based on copyrighted music has grown exponentially and today accounts for

18  a significant percentage of all mobile content providers' revenue.  In order to tap into such

19  demand, mobile content providers must first obtain permission from the copyright owners of

20  the music that is to be sold in the form of ringtones.

21      27.     Owners of copyrighted music, such as Universal Music Group, Inc., among

22  many others, have licensed parts of their libraries of copyrighted music to numerous mobile

23  content providers for the latter to sell to consumers in the form of ringtones. This

24  arrangement allows content providers to focus on developing the mobile content based on the

25  copyrighted music while allowing the copyright owners to remain silent partners operating

26  primarily in the background.

27      28.     While copyright owners are ordinarily compensated by their content provider

28

**FIRST AMENDED COMPLAINT**

7

1   partners through upfront fees, their revenue is frequently generated through a "revenue

2   share" or "equity share" based on mobile content transactions involving their copyrighted

3   material: each time a charge is incurred in connection with the purchase of their copyrighted

4   mobile content, the copyright licensor's industry partners described above cause that charge

5   to be billed directly on the cellular telephone bill of the carrier's customer who currently

6   owns and/or uses the telephone number (claimed to be) associated with said purchase.

7        29.    Licensors have, in California and throughout the nation, registered numerous

8   transactions and processed significant amounts of money over recent years, profiting greatly

9   from their arrangements with industry partners.

10        30.    Licensors have not only sanctioned illegal billing, they have actively

11   promoted it by negotiating and facilitating partnerships with mobile content providers, and

12   by failing to maintain adequate safeguards to prevent unauthorized charges. Despite their

13   knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to

14   collect revenue for the sale of unauthorized mobile content.

15            **Affiliate Marketer's Role in the Scheme to Defraud**

16        31.    Affiliate marketers, such as Glispa, LLC, are Internet advertising networks

17   that provide a distribution platform for mobile content providers' products and services.

18        32.    Advertising is an essential element in the mobile content industry. Without

19   the ability to drive users to their websites, mobile content providers, aggregators, and others

20   up the profit chain would be virtually unable to earn any revenue. Absent advertising

21   through affiliate marketers, mobile content providers and aggregators would have

22   significantly fewer visitors to their websites and their illegal revenues would drop

23   dramatically.

24        33.    Many affiliate marketers with whom mobile content providers contract fail to

25   clearly and accurately disclose a host of highly relevant information to consumers about

26   purchasing mobile content, such as the price of the services, the subscription period, and the

27   cancellation procedures, among others.

28   **FIRST AMENDED COMPLAINT**

34.     Indeed, many affiliate marketers, specifically employ anti-consumer practices simply to achieve the next "sale." For example, many affiliate marketers employ a so-called "negative option" gambit, which involves the practice of presenting a consumer with the opportunity to consent in advance in order to continue to receive products or services in the future until the consumer cancels such service. In such situations, the seller frequently interprets the consumer's silence or failure to take an affirmative action to reject goods or services, or to cancel the sales agreement, as an agreement or consent to continue receiving the offer, when in fact the consumer intends just the opposite.

35.     Affiliate marketers are loath to adequately disclose the relevant information about purchasing mobile content for fear of scaring off potential "customers." Deceptive affiliate marketers have systematically declined to comply with the requirements imposed by content providers and others, which require affiliate marketers to obtain consumers' actual consent prior to causing such consumers to be billed.

36.     Indeed, if Defendants wanted to end this illegal billing, it could do so in an instant. All they would have to do to ensure that they obtain the consent of the charged parties is agree, with their industry partners, to require a customer to provide an "access code," which can be provided by the wireless carrier to the account holder at the time the wireless account is opened. In turn, the carrier and aggregators can require that this access code be produced anytime an affiliate marketer attempts to apply a mobile content charge to a consumer's cell phone account. If a matching access code is not provided, no charges would be processed to the customer's billing statement.

37.     Instead of implementing such a simple safeguard, Defendants and their industry partners have intentionally created, maintained, and promoted a system that encourages fraud at every step.

38.     Defendants' conduct is by no means accidental. As previously alleged, Defendants know that many consumers have disputed and continue to dispute claims that they consented to be charged for mobile content services. Defendants further know that they

**FIRST AMENDED COMPLAINT**

9

1   cannot authenticate those consumers' authority to be billed.  In light of this knowledge,

2   Defendants decision to continue to cause consumers to be charged for mobile content without

3   taking steps to authenticate the consumers' authorization constitutes a deliberate and willful

4   scheme to cheat large numbers of people out of small amounts of money.

5        39.    Because the amount Defendants are taking is small on an individual basis—as

6   little as a few dollars to at most several hundreds of dollars per person—Defendants employ

7   this scheme with the hope and expectation that their illegal conduct will go unpunished.

8             **THE FACTS RELATING TO NAMED PLAINTIFF PFROMMER**

9        40.    In or about 2005, Plaintiff Pfrommer ("Pfrommer") obtained cell phone

10   service from an authorized sales representative of an established wireless carrier.

11        41.    On that same day, in exchange for a cellular telephone service plan, Pfrommer

12   agreed to pay his wireless carrier a set fee for a period of several months.

13        42.    In or about 2008, Pfrommer's cell phone account was charged for unwanted

14   mobile content services by Defendants.

15        43.    At no time did Pfrommer authorize the purchase of these products and

16   services provided and/or marketed by Defendants.

17        44.    During the relevant time period, Defendants caused Pfrommer to be charged

18   service fees in the amount of several dollars for such mobile content charges.

19        45.    At no time did Pfrommer authorize Defendants or anyone else to bill him for

20   these charges and at no time did Defendants or anyone else verify Pfrommer's purported

21   authorization of these charges.

22        46.    Neither Defendants nor their industry partners have provided Pfrommer with a

23   full refund of the unauthorized charges consisting of the premium text message charges,

24   ordinary text messages, data charges, back interest, implement adequate procedures to ensure

25   that such unauthorized charges would not appear in future billing periods and/or an assurance

26   that such unauthorized charges would not appear in future billing periods.

27             **THE FACTS RELATING TO NAMED PLAINTIFF WATSON**

28   FIRST AMENDED COMPLAINT

1    47.    In or about 2006, Plaintiff Watson ("Watson") obtained cell phone service

2    from an authorized sales representative of an established wireless carrier.

3    48.    On that same day, in exchange for a cellular telephone service plan, Watson

4    agreed to pay his wireless carrier a set fee for a period of several months.

5    49.    In or about 2007, Watson's cell phone account was charged for unwanted

6    mobile content services by Defendants.

7    50.    At no time did Watson authorize the purchase of these products and services

8    provided and/or marketed by Defendants.

9    51.    During the relevant time period, Defendants caused Watson to be charged

10   service fees in the amount of several dollars for such mobile content charges.

11   52.    At no time did Watson authorize Defendants or anyone else to bill him for

12   these charges and at no time did Defendants or anyone else verify Watson's purported

13   authorization of these charges.

14   53.    Neither Defendants nor their industry partners have provided Watson with a

15   full refund of the unauthorized charges consisting of the premium text message charges,

16   ordinary text messages, data charges, back interest, implement adequate procedures to ensure

17   that such unauthorized charges would not appear in future billing periods and/or an assurance

18   that such unauthorized charges would not appear in future billing periods.

19

20                            **CLASS ALLEGATIONS**

21   54.    Plaintiffs bring this action, pursuant to Code of Civil Procedure § 382, on

22   behalf of themselves and three classes:

23   i)     The Glomobi Class ("Glomobi Class") all wireless telephone subscribers

24          worldwide who suffered losses or damages as a result of Glomobi causing

25          charges to be billed for mobile content products and services not authorized

26          by the subscriber (the "Class"); provided, however, that the following are

27          excluded from the Class: (i) Defendants, and (ii) any employee of the

28   FIRST AMENDED COMPLAINT

1         Defendants.

2     ii)    The Frengo Class ("Frengo Class") all wireless telephone subscribers

3         worldwide who suffered losses or damages as a result of Frengo causing

4         charges to be billed for mobile content products and services not authorized

5         by the subscriber (the "Class"); provided, however, that the following are

6         excluded from the Class: (i) Defendants, and (ii) any employee of the

7         Defendants.

8     iii)    The mBlox Class ("mBlox Class") all wireless telephone subscribers

9         worldwide who suffered losses or damages as a result of mBlox billing for

10         mobile content products and services not authorized by the subscriber (the

11         "Class"); provided, however, that the following are excluded from the Class:

12         (i) Defendants, and (ii) any employee of the Defendants.

13     55.    The Classes consists of thousands of individuals and other entities nationwide,

14 making joinder impractical, in satisfaction of Code of Civil Procedure § 382.

15     56.    The claims of Plaintiffs are typical of the claims of all of the other members of

16 the Classes.

17     57.    Plaintiffs will fairly and adequately represent and protect the interests of the

18 other members of the Classes.  Plaintiffs have retained counsel with substantial experience in

19 prosecuting complex litigation and class actions.  Plaintiffs and their counsel are committed

20 to vigorously prosecuting this action on behalf of the members of the Classes, and have the

21 financial resources to do so.  Neither Plaintiff nor their counsel have any interest adverse to

22 those of the other members of the Classes.

23     58.    Absent a class action, most members of the Classes would find the cost of

24 litigating their claims to be prohibitive, and will have no effective remedy.  The class

25 treatment of common questions of law and fact is also superior to multiple individual actions

26 or piecemeal litigation in that it conserves the resources of the courts and the litigants, and

27 promotes consistency and efficiency of adjudication.

28

**FIRST AMENDED COMPLAINT**

59.     Defendants have acted and failed to act on grounds generally applicable to the Plaintiffs and the other members of the Classes, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Classes.

60.     The factual and legal bases of Defendants' liability to Plaintiffs and to the other members of the Classes are the same, resulting in injury to the Plaintiffs and to all of the other members of the Classes.  Plaintiffs and the other members of the Classes have all suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

61.     There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Class.

62.     Common questions for the Classes include but are not limited to the following:

(a)     Whether Defendants have unjustly received money belonging to Plaintiffs and the respective Classes and whether under principles of equity and good conscience, Defendants should not be permitted to retain it;

(b)     Whether Defendants tortiously interfered with contracts between Plaintiffs and the respective Classes, on the one hand, and their wireless carriers, on the other hand, by causing them to be charged for products and services by their carriers that were unauthorized; and

(c)     Whether Defendants' conduct described herein violates California Business and Professions Code sections 17200, *et seq*;

## COUNT I

### Violation of the California Consumer Legal Remedies Act ("CLRA"),

### Cal. Civ. Code § 1770

63.     Plaintiffs incorporate by reference the foregoing allegations.

64.     The mobile content services that are the subject of this complaint are services for other than a commercial or business use, as described in Cal. Civ. Code § 1761(b). The

**FIRST AMENDED COMPLAINT**

13

1    mobile content services are used for personal, family, or household purposes, and mobile

2    content service subscribers are consumers under the definition in Cal. Civ. Code § 1761(d).

3    Plaintiffs and the other members of the Class use the wireless services acquired from wireless

4    carriers for personal, family, or household purposes, and are consumers under the definition

5    in Cal. Civ. Code § 1761(d).

6           65.    Defendants misrepresent the approval for, characteristics of, and the

7    obligations associated with the mobile content services when they transmit billing

8    instructions to aggregators, carriers and other entities for mobile content services to Plaintiffs

9    and the other members of the Classes, which indicate that the mobile content services and the

10   correspondingly charges for those services were approved. These bills cause the Plaintiffs

11   and the other class members to pay charges for mobile content services to which they did not

12   consent, and violate Cal. Civ. Code § 1770(a)(2), (5), (14).

13          66.    Collectively, these CLRA violations have damaged the Plaintiffs and other

14   members of the Classes by causing them to pay falsely inflated cellular service bills to their

15   carriers as well as the lost time required to sort, read, discard and attempt to prevent future

16   charges for unwanted mobile content services, and lost storage space, connectivity, and

17   computing resources on their cellular phones.

18          67.    Plaintiffs, on their own behalf and behalf of the other members of the Classes,

19   seek an order enjoining Defendants' CLRA violations alleged herein and the imposition of a

20   constructive trust on and restitution of property gained by the CLRA violations, and court

21   costs and attorney's fees under the CLRA (Cal. Civ. Code § 1780(d)).

<div align="center">

**COUNT II**

**Violation of California's Unfair Competition Law ("UCL"),**

**Cal. Bus. & Prof. Code § 17200**

</div>

25          68.    Plaintiffs incorporate by reference the foregoing allegations.

26          69.    Defendants' communications to mobile content providers, aggregators,

27   carriers and/or others falsely state that Plaintiffs and the other members of the Classes have

28

**FIRST AMENDED COMPLAINT**
<div align="center">14</div>

1   approved, authorized, and/or consented to charges for mobile content services, and are

2   deceptive and unfair. Further, Defendants' communications are unlawful because they

3   violate the CLRA, CFAA, and/or the FCA.

4          70.    The acts alleged above are unlawful, unfair or fraudulent business acts or

5   practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

6          71.    Plaintiffs, on their own behalf and behalf of the other class members, seeks an

7   order enjoining Defendants' unfair competition alleged herein, and the imposition of a

8   constructive trust on and restitution of property gained by such unfair competition under the

9   UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorney's fees and costs

10  pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

11

12                                   **COUNT III**

13                            **Restitution/Unjust Enrichment**

14         72.    Plaintiffs incorporate by reference the foregoing allegations.

15         73.    A benefit has been conferred upon Defendants by Plaintiffs and the members

16  of the Classes. Defendants have received and retain money belonging to Plaintiffs and the

17  other members of the Classes resulting from their participation in the billing process and

18  receipt significant amounts of money in unauthorized mobile content charges.

19         74.    Defendants appreciate or have knowledge of said benefit.

20         75.    Under principles of equity and good conscience, Defendants should not be

21  permitted to retain the money belonging to Plaintiffs and the members of the Classes that

22  they have unjustly received as a result of their actions.

23         76.    Plaintiffs and the members of the Classes have suffered loss as a direct result

24  of Defendants' conduct.

25         77.    Plaintiffs, on their own behalf and behalf of the other class members, seek the

26  imposition of a constructive trust on and restitution of the proceeds from the unauthorized

27  charges Defendants have received, as well as attorney's fees and costs pursuant to Cal. Code

28  **FIRST AMENDED COMPLAINT**

1 | Civ. Proc. § 1021.5.

2 | <div align="center">**COUNT IV**</div>

3 | <div align="center">**Trespass to Chattels**</div>

4 |    78. Plaintiffs incorporate by reference the foregoing allegations.

5 |    79. Defendants and/or their agents intentionally and without consent, transmitted

6 | mobile content to Plaintiffs' cellular phone and the wireless devices of the members of the

7 | Classes.

8 |    80. In the course of transmitting mobile content to these wireless devices,

9 | Defendants and/or their agents intentionally and without consent, gained access to these

10 | devices, used these devices, occupied the memory of these devices, and/or dispossessed

11 | Plaintiffs and the members of the Classes of unencumbered access to their wireless devices.

12 |    81. Plaintiffs own, possess, and use their cellular phone.  Likewise, the members

13 | of the Classes own, possess, and use the wireless devices to which Defendants transmitted or

14 | caused to be transmitted mobile content. These wireless devices are the personal property of

15 | the members of the Classes.

16 |    82. In so doing, Defendants intentionally intermeddled with, damaged, and

17 | deprived Plaintiffs and the members of the Classes of their wireless handsets, or a portion

18 | thereof. This damage included, but was not limited to, the unauthorized charges for mobile

19 | content, which Defendants obliged Plaintiffs and the other members of the Classes to pay.

20 | Defendants trespassed on the chattels of Plaintiffs and the other members of the Class.

21 |    83. Plaintiffs, on their own behalf and behalf of the other members of the

22 | respective Class, seek damages from Defendants' trespass, as well as attorney's fees and

23 | costs pursuant to Cal. Code Civ. Proc. § 1021.5.

24 | <div align="center">**COUNT V**</div>

25 | <div align="center">**Tortious Interference with a Contract**</div>

26 |    84. Plaintiffs incorporate by reference the foregoing allegations.

27 |    85. Plaintiffs and the other members of the Classes had contractual relationships

28 | **FIRST AMENDED COMPLAINT**

<div align="center">16</div>

1   with their wireless carriers whereby they agreed to pay a certain sum of money in exchange

2   for activation of their cellular telephone accounts and their carriers' promise to provide

3   various communication and related services and to bill Plaintiffs and the members of the

4   Classes only for those products or services the purchase of which they had authorized.

5         86.     Defendants knew of said contractual relationships and intended to and did

6   induce a breach or disruption of the contractual relationships.

7         87.     Defendants intentionally interfered with said contractual relationships through

8   improper motives and/or means by knowingly and/or recklessly continually causing to be

9   placed on the cellular telephone bills of cellular telephone owners across the nation

10   unauthorized charges.

11        88.     Plaintiffs and the other members of the Classes suffered loss as a direct result

12   of the Defendants' conduct.

13        89.     Plaintiffs, on their own behalf and behalf of the other class members, seek

14   damages from Defendants' tortious interference, as well as attorney's fees and costs pursuant

15   to Cal. Code Civ. Proc. § 1021.5.

16                           **PRAYER FOR RELIEF**

17         WHEREFORE, Plaintiffs William Pfrommer and Michael Watson, on behalf of

18   themselves and the Classes, prays for the following relief:

19             a)   Certify this case as a class action on behalf of the Classes defined above and

20                appoint William Pfrommer and Michael Watson as representative of the

21                Classes, and appoint the undersigned as lead counsel;

22             b)   Declare that the actions of Defendants, as set out above, constitute unjust

23                enrichment, trespass to chattels, and tortious interference with a contract,

24                violate Cal. Civ. Code § 1770 and Cal. Bus. & Prof. Code § 17200;

25             c)   Enter judgment against Defendants for all economic, monetary, actual,

26                consequential, and compensatory damages caused by their conduct, and if

27                their conduct is proved willful, award Plaintiffs and the Classes exemplary

28

1    damages (for the sake of clarity, Plaintiffs explicitly disclaim any claim for

2    damages under the CLRA at this time);

3    d) Award Plaintiffs and the Classes reasonable costs and attorneys' fees;

4    e) Award Plaintiffs and the Classes pre- and post-judgment interest;

5    f) Enter judgment for injunctive and/or declaratory relief as is necessary to

6    protect the interests of Plaintiffs and the Classes; and

7    g) Award such other and further relief as equity and justice may require.

8                                **JURY DEMAND**

9    Plaintiffs request trial by jury of all claims that can be so tried.

10

11

12                                        Respectfully submitted,

13   Dated: June 5, 2009              KAMBEREDELSON, LLC

14

15                                    By:

16                                        ALAN HIMMELFARB
                                          One of the Attorneys for WILLIAM
                                          PFROMMER and MICHAEL
17                                        WATSON, individually and on behalf of
                                          Class of similarly situated individuals
18

19   Alan Himmelfarb (SBN 90480)
     KAMBEREDELSON, LLC
20   2757 Leonis Boulevard
     Vernon, California 90058
21   Telephone: (323) 585-8696

22

23

24

25

26

27

28
     **FIRST AMENDED COMPLAINT**
                                    18

# EXHIBIT C

1  Alan Himmelfarb (SBN 90480)
2  KAMBEREDELSON, LLC
   2757 Leonis Boulevard
3  Vernon, California 90058
   Telephone: (323) 585-8696
4
5  *Attorneys for Plaintiff*

6            SUPERIOR COURT OF THE STATE OF CALIFORNIA

7               FOR THE COUNTY OF STANISLAUS

8
   WILLIAM PFROMMER and MICHAEL        ) Case No.
9  WATSON, individually and on behalf of a  )
   class of similarly situated individuals,   ) **SECOND AMENDED CLASS**
10                                            ) **ACTION COMPLAINT FOR:**
                                              )
11              Plaintiffs,                   )
                                              )     **(1) Violation of Cal. Civ. Code §**
12 v.                                         )         **1770; and**
                                              )     **(2) Violation of Cal. Bus. &**
13 R & D MEDIA NORTH AMERICAS B.V.           )         **Prof. Code § 17200**
   D/B/A GLOMOBI, a Dutch company,            )     **(3) Unjust Enrichment;**
14 MBLOX, INC., a Delaware corporation,       )     **(4) Trespass to Chattels; and**
                                              )     **(5) Tortious Interference with a**
15              Defendants.                   )         **Contract.**
                                              )
16                                            )
                                              ) DEMAND FOR JURY TRIAL
17                                            )

18                    **CLASS ACTION COMPLAINT**
19
20       Plaintiffs William Pfrommer and Michael Watson bring this first amended class

21 action complaint against Defendants R & D Media North Americas BV, and mBlox, Inc.

22 seeking redress for Defendants' unlawful practice of causing cellular telephone customers to

23 be charged for certain products and services the customers have not authorized.  Plaintiffs,

24 for their class action complaint, allege as follows upon personal knowledge as to themselves

25 and their own acts and experiences, and, as to all other matters, upon information and belief,

26 including investigation conducted by their attorneys.

27
28                           **PARTIES**

**SECOND AMENDED COMPLAINT**

1.   Plaintiff William Pfrommer is a resident of Indiana.

2.   Plaintiff Michael Watson is a resident of Stanislaus County, California.

3.   Defendant R & D Media North Americas BV d/b/a Glomobi ("Glomobi") is a provider of mobile content products and services such as ringtones. Glomobi is a corporation organized under the laws of The Netherlands and headquartered in Amsterdam. Glomobi did business throughout the State of California, the nation and the world.

4.   Defendant mBlox, Inc. ("mBlox") is an aggregator that distributes and bills mobile content consisting of, among other things, music ringtones, wallpapers, games, graphics, horoscopes, data, news, and other information transmitted or received via chat services (collectively, " mobile content"). mBlox is a Delaware corporation with its headquarters and principal place of business in Santa Clara County, California. It, through its parents, subsidiaries and/or affiliates, does business throughout the State of California, the nation and the world.

**JURISDICTION**

5.   This Court has jurisdiction over the causes of action asserted herein pursuant to the California Constitution, Article VI, §10, because this case is a cause not given by statute to other trial courts.

6.   This Court has jurisdiction as a Plaintiff resides in this County and the cause action arose here.

**VENUE**

7.   Venue is proper in this Court pursuant to Code of Civil Procedure because a Plaintiff resides in this county.

**CONDUCT COMPLAINED OF**

8.   This case arises from three closely related phenomena. The first is the capability of most cellular telephones, not only to make and receive telephone calls, but also to send and receive text messages, including—most significantly for present purposes— "premium" text message services. These services, also known as "mobile content," include

**SECOND AMENDED COMPLAINT**

2

products that range from the basic (customized ringtones for use with cell phones, sports score reports, weather alerts, stock tips, horoscope services, and the like) to those requiring more advanced capabilities (such as direct payment services, interactive radio and participatory television).

9.    The second underlying phenomenon of this case is that the method employed throughout the industry to charge customers for mobile content services lacks necessary safeguards.  Just as providers of premium mobile content deliver their products by means of cell phone technology, they likewise charge and collect from their customers by "piggybacking" on the cell phone bills sent out by the wireless carriers.  Further, because the mobile content providers by themselves most often lack the wherewithal to negotiate the necessary relationships with the much larger wireless carriers, they do so with the help of third-party companies, known as aggregators.  These aggregators act as middle-men, representing numerous mobile content providers in arriving at agreements that allow these mobile content providers to use the wireless carriers' billing and collection mechanisms.  In turn, both the aggregators, such as Defendant mBlox, and the wireless carriers are compensated for their services by retaining a substantial percentage of the amount charged in each premium mobile content transaction.

10.    The rapid and largely unplanned growth of the premium mobile content industry has led both to the above-described structure and to a disastrous flaw within it.  That flaw is an open secret within the industry, but little understood outside of it.  In short, the billing and collection systems established and/or propagated by companies including Defendants in aid of the premium mobile content industry that enriches them are conspicuously free of any checks or safeguards to prevent erroneous and unauthorized charges from being added to customers' bills.

11.    The third underlying phenomenon of this case centers on the mechanism mobile content providers utilize to attract and drive users to their websites to earn revenue. Mobile content providers contract with affiliate marketers that provide a distribution platform

**SECOND AMENDED COMPLAINT**

1    for mobile content providers' products and services.  Affiliate marketers accumulate lists of

2    potential customers, primarily through websites they maintain on the internet, and pass these

3    lists onto mobile content providers.  Many mobile content providers, including Defendant

4    Glomobi, request that affiliate marketers ensure that they obtain customers' consent prior to

5    sending on the customers' information.  However, many affiliate marketers, fail to obtain

6    such consent and fail to accurately and clearly disclose in their advertisements important

7    information about these products and services—such as the price of the products and

8    services, the subscription period, and/or the cancellation procedures—prior to causing the

9    billing process to occur.  Through these deceptive marketing practices, many consumers are

10   improperly charged for products and services that they did not agree to purchase.

11        12.    The rapid and largely unplanned growth of the premium mobile content

12   industry has led both to the above-described structure of the industry and to a disastrous flaw

13   within it.  That flaw—understood, perpetuated, and even encouraged by carriers, aggregators,

14   mobile content providers, and affiliate marketers—is an open secret within the industry, but

15   little understood outside of it.  In short, the authorization, billing and collection systems

16   established and/or propagated by companies are conspicuously free of any checks or

17   safeguards to prevent erroneous and unauthorized charges from being added to customers'

18   bills.

19        13.    Affiliate marketers exploit this flaw by marketing content that is sold through

20   the carriers' mobile commerce applications installed on consumers' cellular telephones

21   (commonly referred to as "on-portal" or "on-deck" transactions), and/or through a variety of

22   other mediums such as television, radio, and non-mobile Internet websites (collectively

23   known as "off-portal" or "off-deck" transactions).

24        14.    As Defendants also know, significant amounts of money have been collected

25   on account of such unauthorized charges for premium mobile content in the industry over the

26   last few years.  And, while it has always been within the power of companies to institute

27   simple and effective measures that would prevent this, they have instead knowingly

28   **SECOND AMENDED COMPLAINT**

4

1  maintained the very system that has allowed these erroneous charges.

2       15.    While the total sales in California and the nation of premium mobile content

3  in 2008 amount to a significant sum, the business is still in its infancy.  The burgeoning

4  industry has already expanded from ordinary ringtones into mass media-related products

5  such as interactive radio and participatory voting at television and concert events and, most

6  recently, into services that enable cell phones to function as credit cards.  Unchecked,

7  Defendants' practices will injure an ever-increasing number of unwitting consumers,

8  inflicting damages of an untold magnitude.

9                    **Glomobi's Role in the Scheme to Defraud**

10      16.    Unlike transactions made using checks and credit cards, which require a

11  signature or a highly private sixteen-digit credit card number, the only information a mobile

12  content provider needs to charge a consumer for mobile content is the consumer's cellular

13  telephone number.  Once a mobile content provider receives a consumer's cell phone number

14  from an affiliate marketer, the mobile content provider continues a process that causes that

15  consumer to be billed for services and products irrespective of whether the consumer actually

16  knowingly consented to purchase them.

17      17.    Armed with only a cell phone number, the mobile content provider can then

18  simply provide that number, along with an amount to be charged, to a billing aggregator.

19  The aggregator, in turn, instructs the relevant cellular carrier to add the charge to the bill

20  associated with that cellular phone number.  The charge will then appear on the consumer's

21  cell phone bill, often with only minimal, cryptic identifying information, and rarely—if

22  ever—containing the identity of the affiliate marketer who purportedly retained the consent

23  of the consumer.

24      18.    Because the protections normally present in consumer transactions—such as

25  signatures and private credit card numbers—are absent from this process, the likelihood of

26  false charges increases enormously.  And, because a substantial part of mobile content

27  "sales" are made through websites using misleading, oblique, or inadequately explained

28  **SECOND AMENDED COMPLAINT**

1   "consent" procedures, that likelihood increases by another order of magnitude.  Mobile

2   content providers such as Defendant and affiliate marketers have powerful financial

3   incentives to collect as many cell phone numbers as possible, but little incentive to ensure

4   that the owners of those numbers have truly agreed to purchase their goods and services.

5                              **mBlox's Role in the Scheme to Defraud**

6        19.     In order to tap into the emerging mobile content marketplace, affiliate

7   marketers provide advertising services for mobile content providers, such as the Glomobi,

8   who have obtained access to wireless carriers' mobile communications networks through

9   third-parties known as aggregators.  Aggregators such as mBlox are intermediary companies

10  that offer mobile content providers and affiliate marketers direct access to the carriers

11  through their existing relationships.  Affiliate marketers focus on marketing mobile content

12  developed by content providers, while aggregators manage the complex carrier relationships,

13  distribution, billing, and customer service.

14       20.     Aggregators operate mobile transaction networks that help companies

15  develop, deliver, and bill for mobile content services to compatible mobile devices

16  throughout the State of California and the nation.

17       21.     While aggregators charge mobile content providers some upfront fees, their

18  revenue is primarily generated through a "revenue share" on transactions that are billed to

19  cell phone subscribers.  Each time a charge is incurred in connection with the purchase of

20  mobile content services, the aggregator causes said charge to be billed directly on the cellular

21  telephone bill of the carrier's customer whose cell phone number is (claimed to be)

22  associated with said purchase.

23       22.     Aggregators have forged a crucial link between the wireless carriers and

24  mobile content providers by using their end-to-end technology platforms, their relationships

25  with wireless carriers, and other value-added services.  They have enabled the transformation

26  of wireless technology into a marketing, content delivery, and collections process, while

27  carving out a profitable role for themselves as very critical middlemen in this rapidly

28

**SECOND AMENDED COMPLAINT**

1  growing industry.

2      23.    The carrier then bills and collects the charge from its current subscriber,

3  retains a portion of the proceeds as its "revenue share" and then remits the balance to the

4  aggregator who retains a percentage of the balance in the form of its own "revenue share."

5  The aggregator then remits the remainder directly to the mobile content provider, who then

6  remits payment in a fixed amount of revenue share to the appropriate affiliate marketer.

7      24.    In the United States, aggregators have registered numerous transactions and

8  processed significant amounts of money over recent years.  Aggregators such as Glomobi

9  have profited greatly from their arrangement with industry partners.

10                **Copyright Licensor's Role in the Scheme to Defraud**

11      25.    Since the advent of customized cellular telephone ringtones, the demand for

12  mobile content based on copyrighted music has grown exponentially and today accounts for

13  a significant percentage of all mobile content providers' revenue.  In order to tap into such

14  demand, mobile content providers must first obtain permission from the copyright owners of

15  the music that is to be sold in the form of ringtones.

16      26.    Owners of copyrighted music, such as Universal Music Group, Inc., among

17  many others, have licensed parts of their libraries of copyrighted music to numerous mobile

18  content providers for the latter to sell to consumers in the form of ringtones. This

19  arrangement allows content providers to focus on developing the mobile content based on the

20  copyrighted music while allowing the copyright owners to remain silent partners operating

21  primarily in the background.

22      27.    While copyright owners are ordinarily compensated by their content provider

23  partners through upfront fees, their revenue is frequently generated through a "revenue

24  share" or "equity share" based on mobile content transactions involving their copyrighted

25  material: each time a charge is incurred in connection with the purchase of their copyrighted

26  mobile content, the copyright licensor's industry partners described above cause that charge

27  to be billed directly on the cellular telephone bill of the carrier's customer who currently

28  **SECOND AMENDED COMPLAINT**

1    owns and/or uses the telephone number (claimed to be) associated with said purchase.

2         28.    Licensors have, in California and throughout the nation, registered numerous

3    transactions and processed significant amounts of money over recent years, profiting greatly

4    from their arrangements with industry partners.

5         29.    Licensors have not only sanctioned illegal billing, they have actively

6    promoted it by negotiating and facilitating partnerships with mobile content providers, and

7    by failing to maintain adequate safeguards to prevent unauthorized charges.  Despite their

8    knowledge of such illegal practices and lack of reliable safeguards, Licensors continue to

9    collect revenue for the sale of unauthorized mobile content.

10                   **Affiliate Marketer's Role in the Scheme to Defraud**

11        30.    Affiliate marketers, such as Glispa, LLC, are Internet advertising networks

12   that provide a distribution platform for mobile content providers' products and services.

13        31.    Advertising is an essential element in the mobile content industry.  Without

14   the ability to drive users to their websites, mobile content providers, aggregators, and others

15   up the profit chain would be virtually unable to earn any revenue.  Absent advertising

16   through affiliate marketers, mobile content providers and aggregators would have

17   significantly fewer visitors to their websites and their illegal revenues would drop

18   dramatically.

19        32.    Many affiliate marketers with whom mobile content providers contract fail to

20   clearly and accurately disclose a host of highly relevant information to consumers about

21   purchasing mobile content, such as the price of the services, the subscription period, and the

22   cancellation procedures, among others.

23        33.    Indeed, many affiliate marketers, specifically employ anti-consumer practices

24   simply to achieve the next "sale."  For example, many affiliate marketers employ a so-called

25   "negative option" gambit, which involves the practice of presenting a consumer with the

26   opportunity to consent in advance in order to continue to receive products or services in the

27   future until the consumer cancels such service.  In such situations, the seller frequently

28   **SECOND AMENDED COMPLAINT**

1  interprets the consumer's silence or failure to take an affirmative action to reject goods or

2  services, or to cancel the sales agreement, as an agreement or consent to continue receiving

3  the offer, when in fact the consumer intends just the opposite.

4       34.    Affiliate marketers are loath to adequately disclose the relevant information

5  about purchasing mobile content for fear of scaring off potential "customers." Deceptive

6  affiliate marketers have systematically declined to comply with the requirements imposed by

7  content providers and others, which require affiliate marketers to obtain consumers' actual

8  consent prior to causing such consumers to be billed.

9       35.    Indeed, if Defendants wanted to end this illegal billing, it could do so in an

10  instant. All they would have to do to ensure that they obtain the consent of the charged

11  parties is agree, with their industry partners, to require a customer to provide an "access

12  code," which can be provided by the wireless carrier to the account holder at the time the

13  wireless account is opened. In turn, the carrier and aggregators can require that this access

14  code be produced anytime an affiliate marketer attempts to apply a mobile content charge to

15  a consumer's cell phone account. If a matching access code is not provided, no charges

16  would be processed to the customer's billing statement.

17       36.    Instead of implementing such a simple safeguard, Defendants and their

18  industry partners have intentionally created, maintained, and promoted a system that

19  encourages fraud at every step.

20       37.    Defendants' conduct is by no means accidental. As previously alleged,

21  Defendants know that many consumers have disputed and continue to dispute claims that

22  they consented to be charged for mobile content services. Defendants further know that they

23  cannot authenticate those consumers' authority to be billed. In light of this knowledge,

24  Defendants decision to continue to cause consumers to be charged for mobile content without

25  taking steps to authenticate the consumers' authorization constitutes a deliberate and willful

26  scheme to cheat large numbers of people out of small amounts of money.

27       38.    Because the amount Defendants are taking is small on an individual basis—as

28

**SECOND AMENDED COMPLAINT**

1    little as a few dollars to at most several hundreds of dollars per person—Defendants employ

2    this scheme with the hope and expectation that their illegal conduct will go unpunished.

3              **THE FACTS RELATING TO NAMED PLAINTIFF PFROMMER**

4         39.    In or about 2005, Plaintiff Pfrommer ("Pfrommer") obtained cell phone

5    service from an authorized sales representative of an established wireless carrier.

6         40.    On that same day, in exchange for a cellular telephone service plan, Pfrommer

7    agreed to pay his wireless carrier a set fee for a period of several months.

8         41.    In or about 2008, Pfrommer's cell phone account was charged for unwanted

9    mobile content services by Defendants.

10        42.    At no time did Pfrommer authorize the purchase of these products and

11   services provided and/or marketed by Defendants.

12        43.    During the relevant time period, Defendants caused Pfrommer to be charged

13   service fees in the amount of several dollars for such mobile content charges.

14        44.    At no time did Pfrommer authorize Defendants or anyone else to bill him for

15   these charges and at no time did Defendants or anyone else verify Pfrommer's purported

16   authorization of these charges.

17        45.    Neither Defendants nor their industry partners have provided Pfrommer with a

18   full refund of the unauthorized charges consisting of the premium text message charges,

19   ordinary text messages, data charges, back interest, implement adequate procedures to ensure

20   that such unauthorized charges would not appear in future billing periods and/or an assurance

21   that such unauthorized charges would not appear in future billing periods.

22              **THE FACTS RELATING TO NAMED PLAINTIFF WATSON**

23        46.    In or about 2006, Plaintiff Watson ("Watson") obtained cell phone service

24   from an authorized sales representative of an established wireless carrier.

25        47.    On that same day, in exchange for a cellular telephone service plan, Watson

26   agreed to pay his wireless carrier a set fee for a period of several months.

27        48.    In or about 2007, Watson's cell phone account was charged for unwanted

28
**SECOND AMENDED COMPLAINT**

1   mobile content services by Defendants.

2       49.    At no time did Watson authorize the purchase of these products and services

3   provided and/or marketed by Defendants.

4       50.    During the relevant time period, Defendants caused Watson to be charged

5   service fees in the amount of several dollars for such mobile content charges.

6       51.    At no time did Watson authorize Defendants or anyone else to bill him for

7   these charges and at no time did Defendants or anyone else verify Watson's purported

8   authorization of these charges.

9       52.    Neither Defendants nor their industry partners have provided Watson with a

10   full refund of the unauthorized charges consisting of the premium text message charges,

11   ordinary text messages, data charges, back interest, implement adequate procedures to ensure

12   that such unauthorized charges would not appear in future billing periods and/or an assurance

13   that such unauthorized charges would not appear in future billing periods.

14

15                **CLASS ALLEGATIONS**

16       53.    Plaintiffs bring this action, pursuant to Code of Civil Procedure § 382, on

17   behalf of themselves and two classes:

18       i)     The Glomobi Class ("Glomobi Class") all wireless telephone subscribers

19               worldwide who suffered losses or damages as a result of Glomobi causing

20               charges to be billed for mobile content products and services not authorized

21               by the subscriber (the "Class"); provided, however, that the following are

22               excluded from the Class: (i) Defendants, and (ii) any employee of the

23               Defendants.

24       ii)    The mBlox Class ("mBlox Class") all wireless telephone subscribers

25               worldwide who suffered losses or damages as a result of mBlox billing for

26               mobile content products and services not authorized by the subscriber (the

27               "Class"); provided, however, that the following are excluded from the Class:

28

SECOND AMENDED COMPLAINT

1    (i) Defendants, and (ii) any employee of the Defendants.

2    54.    The Classes consists of thousands of individuals and other entities nationwide,

3    making joinder impractical, in satisfaction of Code of Civil Procedure § 382.

4    55.    The claims of Plaintiffs are typical of the claims of all of the other members of

5    the Classes.

6    56.    Plaintiffs will fairly and adequately represent and protect the interests of the

7    other members of the Classes. Plaintiffs have retained counsel with substantial experience in

8    prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed

9    to vigorously prosecuting this action on behalf of the members of the Classes, and have the

10   financial resources to do so. Neither Plaintiff nor their counsel have any interest adverse to

11   those of the other members of the Classes.

12   57.    Absent a class action, most members of the Classes would find the cost of

13   litigating their claims to be prohibitive, and will have no effective remedy. The class

14   treatment of common questions of law and fact is also superior to multiple individual actions

15   or piecemeal litigation in that it conserves the resources of the courts and the litigants, and

16   promotes consistency and efficiency of adjudication.

17   58.    Defendants have acted and failed to act on grounds generally applicable to the

18   Plaintiffs and the other members of the Classes, requiring the Court's imposition of uniform

19   relief to ensure compatible standards of conduct toward the members of the Classes.

20   59.    The factual and legal bases of Defendants' liability to Plaintiffs and to the

21   other members of the Classes are the same, resulting in injury to the Plaintiffs and to all of

22   the other members of the Classes. Plaintiffs and the other members of the Classes have all

23   suffered harm and damages as a result of Defendants' unlawful and wrongful conduct.

24   60.    There are many questions of law and fact common to the claims of Plaintiffs

25   and the other members of the Classes, and those questions predominate over any questions

26   that may affect individual members of the Class.

27   61.    Common questions for the Classes include but are not limited to the

28
SECOND AMENDED COMPLAINT
12

1  following:

2          (a)     Whether Defendants have unjustly received money belonging to

3  Plaintiffs and the respective Classes and whether under principles of equity and good

4  conscience, Defendants should not be permitted to retain it;

5          (b)     Whether Defendants tortiously interfered with contracts between

6  Plaintiffs and the respective Classes, on the one hand, and their wireless carriers, on

7  the other hand, by causing them to be charged for products and services by their

8  carriers that were unauthorized; and

9          (c)     Whether Defendants' conduct described herein violates California

10  Business and Professions Code sections 17200, *et seq*;

11                                **COUNT I**

12  **Violation of the California Consumer Legal Remedies Act ("CLRA"),**

13                          **Cal. Civ. Code § 1770**

14  62.    Plaintiffs incorporate by reference the foregoing allegations.

15  63.    The mobile content services that are the subject of this complaint are services

16  for other than a commercial or business use, as described in Cal. Civ. Code § 1761(b). The

17  mobile content services are used for personal, family, or household purposes, and mobile

18  content service subscribers are consumers under the definition in Cal. Civ. Code § 1761(d).

19  Plaintiffs and the other members of the Class use the wireless services acquired from wireless

20  carriers for personal, family, or household purposes, and are consumers under the definition

21  in Cal. Civ. Code § 1761(d).

22  64.    Defendants misrepresent the approval for, characteristics of, and the

23  obligations associated with the mobile content services when they transmit billing

24  instructions to aggregators, carriers and other entities for mobile content services to Plaintiffs

25  and the other members of the Classes, which indicate that the mobile content services and the

26  correspondingly charges for those services were approved. These bills cause the Plaintiffs

27  and the other class members to pay charges for mobile content services to which they did not

28  **SECOND AMENDED COMPLAINT**

                                     13

1  consent, and violate Cal. Civ. Code § 1770(a)(2), (5), (14).

2       65.    Collectively, these CLRA violations have damaged the Plaintiffs and other

3  members of the Classes by causing them to pay falsely inflated cellular service bills to their

4  carriers as well as the lost time required to sort, read, discard and attempt to prevent future

5  charges for unwanted mobile content services, and lost storage space, connectivity, and

6  computing resources on their cellular phones.

7       66.    Plaintiffs, on their own behalf and behalf of the other members of the Classes,

8  seek an order enjoining Defendants' CLRA violations alleged herein and the imposition of a

9  constructive trust on and restitution of property gained by the CLRA violations, and court

10  costs and attorney's fees under the CLRA (Cal. Civ. Code § 1780(d)).

11  <div align="center">**COUNT II**</div>

12  <div align="center">**Violation of California's Unfair Competition Law ("UCL"),**</div>

13  <div align="center">**Cal. Bus. & Prof. Code § 17200**</div>

14       67.    Plaintiffs incorporate by reference the foregoing allegations.

15       68.    Defendants' communications to mobile content providers, aggregators,

16  carriers and/or others falsely state that Plaintiffs and the other members of the Classes have

17  approved, authorized, and/or consented to charges for mobile content services, and are

18  deceptive and unfair.  Further, Defendants' communications are unlawful because they

19  violate the CLRA, CFAA, and/or the FCA.

20       69.    The acts alleged above are unlawful, unfair or fraudulent business acts or

21  practices and constitute unfair competition under Cal. Bus. & Prof. Code § 17200.

22       70.    Plaintiffs, on their own behalf and behalf of the other class members, seeks an

23  order enjoining Defendants' unfair competition alleged herein, and the imposition of a

24  constructive trust on and restitution of property gained by such unfair competition under the

25  UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorney's fees and costs

26  pursuant to, in part, Cal. Code Civ. Proc. § 1021.5.

27

28  **SECOND AMENDED COMPLAINT**

<div align="center">14</div>

<div align="center">

**COUNT III**

**Restitution/Unjust Enrichment**

</div>

71.    Plaintiffs incorporate by reference the foregoing allegations.

72.    A benefit has been conferred upon Defendants by Plaintiffs and the members of the Classes. Defendants have received and retain money belonging to Plaintiffs and the other members of the Classes resulting from their participation in the billing process and receipt significant amounts of money in unauthorized mobile content charges.

73.    Defendants appreciate or have knowledge of said benefit.

74.    Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs and the members of the Classes that they have unjustly received as a result of their actions.

75.    Plaintiffs and the members of the Classes have suffered loss as a direct result of Defendants' conduct.

76.    Plaintiffs, on their own behalf and behalf of the other class members, seek the imposition of a constructive trust on and restitution of the proceeds from the unauthorized charges Defendants have received, as well as attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

<div align="center">

**COUNT IV**

**Trespass to Chattels**

</div>

77.    Plaintiffs incorporate by reference the foregoing allegations.

78.    Defendants and/or their agents intentionally and without consent, transmitted mobile content to Plaintiffs' cellular phone and the wireless devices of the members of the Classes.

79.    In the course of transmitting mobile content to these wireless devices, Defendants and/or their agents intentionally and without consent, gained access to these devices, used these devices, occupied the memory of these devices, and/or dispossessed Plaintiffs and the members of the Classes of unencumbered access to their wireless devices.

<u>SECOND AMENDED COMPLAINT</u>

<div align="center">15</div>

80.   Plaintiffs own, possess, and use their cellular phone.  Likewise, the members of the Classes own, possess, and use the wireless devices to which Defendants transmitted or caused to be transmitted mobile content. These wireless devices are the personal property of the members of the Classes.

81.   In so doing, Defendants intentionally intermeddled with, damaged, and deprived Plaintiffs and the members of the Classes of their wireless handsets, or a portion thereof. This damage included, but was not limited to, the unauthorized charges for mobile content, which Defendants obliged Plaintiffs and the other members of the Classes to pay. Defendants trespassed on the chattels of Plaintiffs and the other members of the Class.

82.   Plaintiffs, on their own behalf and behalf of the other members of the respective Class, seek damages from Defendants' trespass, as well as attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

### COUNT V

### Tortious Interference with a Contract

83.   Plaintiffs incorporate by reference the foregoing allegations.

84.   Plaintiffs and the other members of the Classes had contractual relationships with their wireless carriers whereby they agreed to pay a certain sum of money in exchange for activation of their cellular telephone accounts and their carriers' promise to provide various communication and related services and to bill Plaintiffs and the members of the Classes only for those products or services the purchase of which they had authorized.

85.   Defendants knew of said contractual relationships and intended to and did induce a breach or disruption of the contractual relationships.

86.   Defendants intentionally interfered with said contractual relationships through improper motives and/or means by knowingly and/or recklessly continually causing to be placed on the cellular telephone bills of cellular telephone owners across the nation unauthorized charges.

87.   Plaintiffs and the other members of the Classes suffered loss as a direct result

SECOND AMENDED COMPLAINT

1 | of the Defendants' conduct.

2 |      88.    Plaintiffs, on their own behalf and behalf of the other class members, seek

3 | damages from Defendants' tortious interference, as well as attorney's fees and costs pursuant

4 | to Cal. Code Civ. Proc. § 1021.5.

5 | <div align="center">**PRAYER FOR RELIEF**</div>

6 |     WHEREFORE, Plaintiffs William Pfrommer and Michael Watson, on behalf of

7 | themselves and the Classes, prays for the following relief:

8 |     a)  Certify this case as a class action on behalf of the Classes defined above and

9 |         appoint William Pfrommer and Michael Watson as representative of the

10 |         Classes, and appoint the undersigned as lead counsel;

11 |     b)  Declare that the actions of Defendants, as set out above, constitute unjust

12 |         enrichment, trespass to chattels, and tortious interference with a contract,

13 |         violate Cal. Civ. Code § 1770 and Cal. Bus. & Prof. Code § 17200;

14 |     c)  Enter judgment against Defendants for all economic, monetary, actual,

15 |         consequential, and compensatory damages caused by their conduct, and if

16 |         their conduct is proved willful, award Plaintiffs and the Classes exemplary

17 |         damages (for the sake of clarity, Plaintiffs explicitly disclaim any claim for

18 |         damages under the CLRA at this time);

19 |     d)  Award Plaintiffs and the Classes reasonable costs and attorneys' fees;

20 |     e)  Award Plaintiffs and the Classes pre- and post-judgment interest;

21 |     f)  Enter judgment for injunctive and/or declaratory relief as is necessary to

22 |         protect the interests of Plaintiffs and the Classes; and

23 |     g)  Award such other and further relief as equity and justice may require.

24 | <div align="center">**JURY DEMAND**</div>

25 |     Plaintiffs request trial by jury of all claims that can be so tried.

26 |

27 |

28 | <u>**SECOND AMENDED COMPLAINT**</u>

<div align="center">17</div>

Respectfully submitted,

Dated: August ___, 2009

KAMBEREDELSON, LLC

By: _____
    ALAN HIMMELFARB
    One of the Attorneys for WILLIAM
    PFROMMER and MICHAEL
    WATSON, individually and on behalf of
    Class of similarly situated individuals

Alan Himmelfarb (SBN 90480)
KAMBEREDELSON, LLC
2757 Leonis Boulevard
Vernon, California 90058
Telephone: (323) 585-8696

**SECOND AMENDED COMPLAINT**

18

**PROOF OF SERVICE**

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is KAMBEREDELSON, LLC, 2757 Leonis Boulevard, Vernon, California, 90058.

On August 5, 2009, I served the following documents:

1. Plaintiff's Supplemental Case Management Statement, And Request For The Voluntarily Dismissal (Without Prejudice) As To Defendant Admarvel, And, Request For Leave To File Second Amended Complaint

2. Declaration Of Alan Himmelfarb In Support Of Plaintiff's Motion To Voluntarily Dismiss The Complaint Without Prejudice As They Pertain To Admarvel, Inc. a/k/a Frengo Corporation, Proposed Second Amended Complaint

[X]   by causing true and accurate copies of such paper to be transmitted to the persons shown below via electronic mail; and

[ ]   by causing true and accurate copies of such paper to be placed in postage prepaid envelopes addressed to the persons shown below and by causing such envelopes to be deposited in the United States Mailbox at Los Angeles, California.

TONIA OUELLETTE KLAUSNER
Wilson Sonsini Goodrich & Rosati PC
1301 Avenue of the Americas
New York, New York 10019
tklausner@wsgr.com
*Counsel for Defendant* ADMARVEL, INC.
A/K/ FRENGO CORPORATION

CHUNG-HAN LEE
WILDMAN HARROLD ALLEN & DIXON, LLP
225 West Wacker Drive
Chicago, Illinois 60606-1229
leechung@wildmand.com
*Counsel for Defendant* MBLOX, INC.

ROBERT BODZIN
Burnham Brown
1901 Harrison Street, 11th Floor
Oakland, California 94612-3501
rbodzin@burnhambrown.com
*Counsel for Defendant* R&D MEDIA
NORTH AMERICAS B.V. d/b/a.
GLOMOBI

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on August 5, 2009, at Vernon, California.

Alan Himmelfarb